FILED
United States Court of Appeals
Tenth Circuit

July 23, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

COLORADO CHRISTIAN
UNIVERSITY,

        Plaintiff-Appellant,

   v.

JUDY P. WEAVER, in her official
capacity as Chair of the Colorado
commission on Higher Education;
RAYMOND T. BAKER, Chair of the
Colorado Commission on Higher
Education; RICHARD GARCIA,
official capacity as commissioner of
the Colorado Commission on Higher
Education; DEAN L. QUAMME,
Vice Chair of the Colorado
Commission on Higher Education;
GREG C. STEVINSON,  official
capacity as commissioner of the
Colorado Commission on Higher
Education; JAMES M. STEWART,
official capacity as commissioner of
the Colorado Commission on Higher
Education; RICK RAMIREZ,  in his
official capacity as a member of the
Colorado Commission on Higher
Education; DAVID SKAGGS, in his
official capacity as Executive Director
of the Colorado Commission on
Higher Education and of the Colorado
Department of Higher Education;
EDWARD ROBINSON,  in his official
capacity as a member of the Colorado
Commission on Higher Education,

No. 07-1247

Defendants-Appellees,

and

AMERICAN CENTER FOR LAW AND JUSTICE; UNITED STATES OF AMERICA; COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES; AMERICAN ASSOCIATION OF PRESIDENTS OF INDEPENDENT COLLEGES AND UNIVERSITIES; CENTER FOR PUBLIC JUSTICE; FOUNDATION FOR MORAL LAW; NATIONAL ASSOCIATION OF EVANGELICALS; BECKET FUND FOR RELIGIOUS LIBERTY AND VARIOUS CHRISTIAN, JEWISH AND MUSLIM ORGANIZATIONS; THE CATHOLIC UNIVERSITY OF AMERICA; THE NATIONAL EDUCATION ASSOCIATION; COLORADO EDUCATION ASSOCIATION; NATIONAL SCHOOL BOARDS ASSOCIATION; NATIONAL PARENT TEACHER ASSOCIATION; AMERICAN JEWISH CONGRESS, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; AMERICAN CIVIL LIBERTIES UNION; PEOPLE FOR THE AMERICAN WAY FOUNDATION; THE ANTI-DEFAMATION LEAGUE; THE AMERICAN FEDERATION OF TEACHERS; THE AMERICAN JEWISH COMMITTEE,

Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 04-CV-02512-MSK-BNB)**

Gregory S. Baylor, Center for Law & Religious Freedom, Springfield, Virginia (Timothy J. Tracey & Isaac Fong, Center for Law & Religious Freedom, Springfield, Virginia; Eric V. Hall & L. Martin Nussbaum, Rothgerber Johnson & Lyons, LLP, Colorado Springs, Colorado; Thomas N. Scheffel, Thomas N. Scheffel & Associates, P.C., Denver, Colorado; Benjamin W. Bull & Gary S. McCaleb, Alliance Defense Fund, Scottsdale, Arizona, with him on the briefs) for Plaintiff-Appellant.

Daniel D. Domenico, Solicitor General (John W. Suthers, Attorney General, John R. Sleeman, Jr., Deputy Attorney General, Antony B. Dyl & Michelle M. Merz, Assistant Attorneys General with him on the briefs) Denver, Colorado, for Defendants-Appellees.

Rena J. Comisac, Acting Assistant Attorney General, Mark L. Gross & Dirk C. Phillips, Attorneys, United States Department of Justice, Civil Rights Division for United States as Amicus Curiae in support of Plaintiff-Appellant.

Michael J. Norton, Burns, Figa & Will, P.C., Greenwood Village, Colorado; Douglas Laycock, University of Michigan Law School, Ann Arbor, Michigan; & Carl H. Esbeck, Columbia, Missouri for Center for Public Justice and National Association of Evangelicals as Amici Curiae in support of Plaintiff-Appellant.

Eric. C. Rassbach & Roger T. Severino for The Becket Fund for Religious Liberty as Amicus Curiae in support of Plaintiff-Appellant.

Jay Alan Sekulow, Washington, D.C., Francis J. Manion, & Geoffrey R. Surtees, New Hope, Kentucky for American Center for Law and Justice as Amicus Curiae in support of Plaintiff-Appellant.

Stuart J. Lark, Holme Roberts & Owen LLP, Colorado Springs, Colorado, for The Council for Christian Colleges & Universities, The American Association of Presidents of Independent Colleges and Universities, and The Catholic University of America as Amici Curiae in support of Plaintiff-Appellant.

Gregory M. Jones & Benjamin D. DuPré, Montgomery, Alabama for Foundation for Moral Law as Amicus Curiae in support of Plaintiff-Appellant.

Walter Dellinger with Michael Bern, Franciska Coleman & Jessica Lindeman (Student Participants), Harvard Law School, Supreme Court and Appellate Practice Clinic;  Pamela Harris & Allison Orr Larsen, O'Melveny & Myers LLP, Washington, D.C.; Marc Stern, American Jewish Congress, New York, New York; Ayesha N. Khan & Richard B. Katskee, Americans United for Separation of Church and State, Washington, D.C.; Daniel Mach, American Civil Liberties Union Foundation, Washington, D.C.; Mark Silverstein, American Civil Liberties Union of Colorado, Denver, Colorado; Judith E. Schaeffer, People For the American Way Foundation, Washington, D.C.; Steven M. Freeman & Steven C. Sheinberg, Anti-Defamation League, New York, New York; David Strom, American Federation of Teachers, Washington, D.C.; Joshua J. Kunis, American Jewish Congress, New York, New York for American Jewish Congress, Americans United for Separation of Church and State, American Civil Liberties Union, People For the American Way Foundation, the Anti-Defamation League, the American Federation of Teachers, and the American Jewish Congress as Amici Curiae in support of Defendants-Appellees.

John M. West, Bredhoff & Kaiser, P.L.L.C., Washington, D.C.; Francisco M. Negron, Jr., National School Boards Association, Alexandria, Virginia; Robert H. Chanin, National Education Association, Washington, D.C.; Martha R. Houser, Colorado Education Association, for National Education Association, Denver, Colorado; Colorado Education Association, National School Boards Association, and National Parent Teacher Association as Amici Curiae in support of Defendants-Appellees.

---

Before **McCONNELL**, **SEYMOUR** and **HOLMES**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

The State of Colorado provides scholarships to eligible students who attend any accredited college in the state—public or private, secular or religious—other than those the state deems "pervasively sectarian."  To determine whether a

-4-

school is "pervasively sectarian," state officials are directed, among other things, to examine whether the policies enacted by school trustees adhere too closely to religious doctrine, whether all students and faculty share a single "religious persuasion," and whether the contents of college theology courses tend to "indoctrinate." Applying these criteria, state officials have extended scholarships to students attending a Methodist university and a Roman Catholic university run by the Jesuit order. They have refused scholarships to otherwise eligible students attending a non-denominational evangelical Protestant university and a Buddhist university. Colorado Christian University, one of the two schools held pervasively sectarian by the State, contends that excluding its students on the basis of this inquiry violates the First and Fourteenth Amendments. The district court disagreed, and granted summary judgment in favor of the state defendants. We find the exclusion unconstitutional for two reasons: the program expressly discriminates among religions without constitutional justification, and its criteria for doing so involve unconstitutionally intrusive scrutiny of religious belief and practice. We reverse, and order that summary judgment be granted in favor of the university.

## I. BACKGROUND

The parties have stipulated to a joint statement of facts, from which we draw the following.

**A. Colorado Scholarship Programs**

Colorado subsidizes higher education in two ways: it provides subsidized education at public universities and scholarships to in-state students who choose to attend private institutions in the State. These scholarships include the Colorado Leveraging Education Assistant Partnership Program, Colo. Rev. Stat. § 23-3.5-102 *et seq.*, Supplemental Leveraging Education Assistant Partnership Program, Colo. Rev. Stat. § 23-3.7-102 *et seq.*, Colorado Student Grants, Colo. Rev. Stat. § 23-3.3-101 *et seq.*, Colorado Work Study, *id.*, and the College Opportunity Fund, Colo. Rev. Stat. § 23-18-102 *et seq.* Details of these programs vary, but the differences are not pertinent to this dispute. *See infra* note 1. The scholarships are administered by the Colorado Commission on Higher Education. The Defendants-Appellees are members or officers of the Commission.

To be eligible for any of the scholarship programs, a student must attend an "institution of higher education." Colo. Rev. Stat. §§ 23-3.5-102(2), -3.3-101(2), -3.7-102(3), -18-102(5)(a)(I). The state statutes defining such an institution exclude any college that is "pervasively sectarian" as a matter of state law. *Id.* §§ -3.5-102(3)(b), -3.3-101(3)(d), -3.7-102(3)(f), -18-102(9). As to the meaning of this term, the statutes provide:

(1) An institution of higher education shall be deemed not to be pervasively sectarian if it meets the following criteria:

(a) The faculty and students are not exclusively of one religious persuasion.

(b) There is no required attendance at religious convocations or services.

(c) There is a strong commitment to principles of academic freedom.

(d) There are no required courses in religion or theology that tend to indoctrinate or proselytize.

(e) The governing board does not reflect nor is the membership limited to persons of any particular religion.

(f) Funds do not come primarily or predominantly from sources advocating a particular religion.

*Id*. §§ 23-3.5-105, -3.3-101(3)(d), -3.7-104.[1]  The meaning of this provision is not plain on its face.  The provision tells us what institutions "shall be deemed not to be pervasively sectarian" but provides no affirmative definition.  The provision therefore could be construed as a safe harbor for schools that satisfy the criteria, without necessarily implying that failure to satisfy some, but not all, of the criteria must result in exclusion.  The record indicates some confusion among Commission officials on this score.  The Commission's financial aid officer

[1] One of the five scholarship programs, the recently-enacted College Opportunity Fund, does not refer to these six criteria.  Colo. Rev. Stat. § 23-18-102 *et seq*.  However, the parties have litigated this appeal under the assumption, which we accept, that the State's administration of the Fund is no different from the other programs.

testified that "she believed that failing four out of six of the statutory criteria was sufficient to fail the 'pervasively sectarian' test." App. 97, ¶ 53. The chief financial officer of the Commission testified that the Commission "'would rely on the advice of legal counsel' to determine how many factors an institution would have to satisfy before it passed the test" and that "he now believed that an institution '[would] have to meet all of them.'" App. 101, ¶ 74 (brackets and internal quotations in original). That appears to be the Commission's position, at least for now. For purposes of this federal constitutional case, the plaintiff does not challenge the Commission's interpretation of the state law.

The legislative history suggests that the legislature designed these statutes to make funds available as broadly as was thought permissible under the Supreme Court's then-existing Establishment Clause doctrine. *See Americans United for Separation of Church & State Fund v. Colorado*, 648 P.2d 1072, 1075 (Colo. 1982) (describing the "pervasively sectarian" provision as "an attempt to conform to First Amendment doctrine."). When the provision was first adopted in 1977, Supreme Court precedents held "that no state aid at all [may] go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones," *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 755 (1976) (citing *Hunt v. McNair*, 413 U.S. 734 (1973)), and the Court struck down in their entirety state statutes that contained insufficient safeguards against the direct funding of pervasively sectarian institutions. Thus, under the doctrine applicable at the time,

"pervasively sectarian" institutions had to be excluded from direct funding programs in order to fund private education at all. Since that time, the Supreme Court has substantially modified its interpretation of the Establishment Clause. *Mitchell v. Helms*, 530 U.S. 793, 845 (2000) (O'Connor, J., concurring); *see, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002); *Agostini v. Felton*, 521 U.S. 203, 225, 232–34 (1997); *Witters v. Washington Dep't of Services for the Blind*, 474 U.S. 481, 488–89 (1986). The parties agree that under current interpretation, the Establishment Clause poses no bar to inclusion of CCU in the Colorado scholarship programs. The Colorado legislature has not, however, repealed its statutory restriction on "pervasively sectarian" institutions.

## B. Colorado Christian University

Colorado Christian University ("CCU") is an accredited private university in Lakewood, Colorado. It offers education "framed by a Christian world view." App. 87, ¶ 16. Approximately 800–850 of the university's 2,000 students are full-time, non-adult undergraduates enrolled in its College of Undergraduate Studies. The others are graduate, adult, or part-time students. The students adhere to a variety of Christian denominations; a small number—just under 1%—are non-Christians. Students sign a "Lifestyle Covenant Agreement" promising to emulate "the example of Jesus Christ and the teachings of the Bible." App. 92, ¶ 34. This relates to conduct, not belief. They are not required to adhere to any creedal statement. Traditional undergraduate students must

-9-

attend chapel weekly, although those who miss services may watch recordings of the services, attend classes that give chapel credit, or pay a small fine. Of the 26 required courses for undergraduates, four are in theology or Biblical studies.

Unlike students, faculty members and trustees must sign a statement affirming their acceptance of the basic beliefs of the University. The statement explains that the University "unites with the broad, historic evangelical faith rather than affiliating with any specific denomination." App. 88, ¶ 21. It affirms the Bible as the infallible Word of God, the existence of God in the Father, Son and Holy Spirit, the divinity of Jesus Christ, and principles of salvation, present ministry, resurrection, and "the spiritual unity of believers in our Lord Jesus Christ." App. 88–89, ¶ 21. "These declarations . . . establish the essential framework within which members of the University both unite in shared beliefs and explore differences." App. 89, ¶ 21.

The University has adopted the "1940 Statement of Principles of Academic Freedom of the American Association of University Professors," a traditional guarantee of academic freedom. App. 90, ¶ 27. A proviso notes that "[t]he framework within which academic freedom operates is the CCU Statement of Faith." App. 90, ¶ 27. It concludes: "Academic freedom at CCU is based on the premise that because it is God who reveals knowledge, an inherent part of the *imago dei* is a rigorous inquiry into that knowledge, freely using all the academic disciplines." App. 91, ¶ 27.

## C. This Litigation

In September, 2003, CCU applied to participate in the State's financial aid programs. In filling out the application questionnaire, the university asserted that it was "not a theological institution," and that the board of trustees was "not limited to persons of a particular religion," nor were the faculty or students. App. 95–96, ¶ 47, 49. It also attested that the majority of its students were not required to attend religious services or take theology courses, and that in any case the theology courses did "not tend to indoctrinate or proselytize." App. 96, ¶ 51.

Skeptical of these claims, Financial Aid Officer Diane Lindner wrote back to the university in February, 2004, requesting more information about the religious beliefs of the faculty, students, and trustees. She also requested syllabi for the university's theology courses. CCU provided the requested information in a letter, while also taking the position that the state test was "patently unconstitutional." App. 194. CCU compared its status with respect to each criterion with that of Regis University, a Catholic school that had been admitted to the scholarship program.

The Commission concluded that CCU failed to meet at least three of the criteria. After examining the syllabi for the theology courses, the commission decided that the courses impermissibly "tend[ed] to indoctrinate or proselytize." Colo. Rev. Stat. § 23-3.5-105(d). It also concluded that CCU's board of trustees reflected or was limited to a single religion. *Id.* § 23-3.5-105(e). This was

-11-

predicated on the judgment that Christianity constitutes a single religion, without regard to denominational differences. Commission officials disagreed among themselves as to whether the university's statement of faith was consistent with a "commitment to principles of academic freedom." *Id.* § 23-3.5-105(c). Finally, the commission concluded that because of the chapel attendance required for some of its students, the university impermissibly "required attendance at religious convocations or services." *Id.* § 23-3.5-105(b).

CCU continued to dispute these assessments, as well as the legitimacy of the inquiries. After another meeting at which it again argued, to no avail, that this inquiry and exclusion was unconstitutional, CCU filed this lawsuit. The university alleged that the state defendants had violated the Free Exercise, Establishment, and Equal Protection Clauses—both facially and as-applied. It also brought and then dropped a pendent claim under state law that would have challenged the Commission's interpretation of the statute. After stipulating to a set of facts, both sides moved for summary judgment.

The district court granted summary judgment for the state defendants. It concluded that after the Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712 (2004), so long as "there is no manifest evidence that a challenged statute is motivated by hostility towards religious beliefs or practices," discrimination against religion need only be justified by a rational basis. *Colo. Christian Univ. v. Baker*, No. 04-CV-02512, 2007 WL 1489801 at *5 (D. Colo. May 18, 2007).

Finding no such hostility, the court concluded that the State had a legitimate interest in "vindicating" a provision of the Colorado Constitution that forbids appropriating public money to aid religious institutions. *Id.* at \*8. The district court then applied strict scrutiny to CCU's Establishment and Equal Protection claims, but concluded that the State's interest in vindicating its state constitution was compelling and that the statute was narrowly tailored to that interest. *Id.* at \*14–15. CCU appealed.

## II. ANALYSIS

It is now settled that the Establishment Clause permits evenhanded funding of education—religious and secular—through student scholarships. *See Locke v. Davey*, 540 U.S. 712, 719 (2004); *Zelman v. Simmons-Harris*, 536 U.S. 639, 652–53 (2002); *Witters v. Washington Dep't of Services for the Blind*, 474 U.S. 481, 488–89 (1986). It is therefore undisputed that federal law does not *require* Colorado to discriminate against Colorado Christian University in its funding programs. Rather, the parties' dispute centers on whether the State may nonetheless choose to exclude pervasively sectarian institutions, as defined by Colorado law, even when not required to. We conclude that it may not.

The state defendants contend that this issue was definitively resolved in their favor by the Supreme Court in *Locke v. Davey*. CCU argues that *Locke* is distinguishable, and that other principles of First Amendment law point to a decision in its favor. We therefore turn first to the debate over *Locke*.

-13-

**A.** *Locke v. Davey*

It has long been clear that there is some "play in the joints" between what is constitutionally required and what is constitutionally forbidden under the two parts of the First Amendment protecting religious freedom. *Walz v. Tax Comm'n of New York*, 397 U.S. 664, 669 (1970). Just as religion-specific accommodations not required by the Free Exercise Clause are not necessarily forbidden under the Establishment Clause, *see Employment Div. Dep't. of Human Res. of Or. v. Smith*, 494 U.S. 872, 890 (1990); *Cutter v. Wilkinson*, 544 U.S. 709, 720–24 (2005) (setting forth criteria for application of Establishment Clause to legislative accommodations of religion), the Free Exercise Clause does not mandate the inclusion of religious institutions within every government program where their inclusion would be permissible under the Establishment Clause. There is room for legislative discretion.

*Locke* is the Supreme Court's most recent and explicit recognition of that discretion. In *Locke*, the Court ruled that it is constitutional for a state to exclude from an otherwise neutral college scholarship program those who intend to major in "devotional theology," which the Court took to mean those who were studying for the clergy. *See Locke*, 540 U.S. at 722 n.5 (noting that "the only interest at issue here is the State's interest in not funding the religious training of clergy"). Although recognizing that the First Amendment generally prohibits discrimination against religion as such, *id.* at 720, *see Church of the Lukumi Babalu Aye v.*

-14-

*Hialeah*, 508 U.S. 520, 533 (1993), a 7-2 majority of the Court held that the nondiscrimination principle did not extend to a refusal to fund the training of the clergy, at least absent antireligious animus and outside the contours of a public forum for speech. In explaining its decision, the Court reasoned that the State had "merely chosen not to fund a distinct category of instruction." *Locke*, 540 U.S. at 721. It is clear that a state may decide not to create theology departments in its public universities; *Locke* holds that the state may similarly choose to refrain from "even indirectly funding religious instruction that will prepare students for the ministry." *Id.* at 719.

The precise bounds of the *Locke* holding, however, are far from clear. On the one hand, we are disinclined to think that *Locke* is confined to its facts. *See* Douglas Laycock, Comment, *Theology Scholarships, The Pledge of Allegiance, and Religious Liberty: Avoiding the Extremes but Missing the Liberty*, 118 Harv. L. Rev. 155, 184 (2004) (noting that "[o]n its face, the holding [of *Locke*] is confined to the training of clergy, to refusals to fund that are not based on hostility to religion, and to cases that do not involve forums for speech," but predicting that these limitations will prove "illusory"). Presumably, there are other forms of state decisions not to fund religious instruction that would pass muster under the Free Exercise Clause beyond the clergy training involved in *Locke*.

On the other hand, we cannot accept the state defendants' argument that *Locke* subjects all "state decisions about funding religious education" to no more than "rational basis review." Appellees' Br. 33. To be sure, the Court indicated that the State has greater latitude to discriminate in decisions about the use of tax dollars than in its use of regulatory authority, but the Court did not employ the language of "rational basis" except with reference to equal protection claims, *Locke*, 540 U.S. at 720–21 n.3,[2] and did not overrule any prior cases subjecting funding decisions to constitutional scrutiny. *See Mitchell v. Helms*, 530 U.S. 793, 828 (2000) ("[O]ur decisions . . . have prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity"). The Court described discrimination in funding as "disfavor of religion (if it can be called that) . . . of a far milder kind" than discrimination with regard to "criminal []or civil sanctions," such as was involved in *Lukumi*, and

---

[2] *See id.* at 730 (Scalia, J., dissenting) (noting that the majority opinion is "devoid of any mention of standard of review"). That First Amendment challenges to selective funding would be subject only to rational basis scrutiny seems especially unlikely after *Dist. of Columbia v. Heller*, No. 07-290, 2008 WL 2520816, at *29 n.27 (U.S. June 26, 2008). There the court noted that rational basis scrutiny had been applied only to "constitutional commands that are themselves prohibitions on irrational laws." In contrast, the Court said that "[o]bviously the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms. If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id*. (internal citation omitted). The same goes, we assume, for the Free Exercise and Establishment Clauses.

recounted the long history of state refusals to use tax dollars to support the clergy. *Id.* at 720, 722–23. But the Court also indicated that the State's latitude with respect to funding decisions has limits. For example, the Court reaffirmed that students may not constitutionally be required "to choose between their religious beliefs and receiving a governmental benefit," *id.* at 720–21; *see Sherbert v. Verner*, 374 U.S. 398, 404 (1963), and stressed that denying scholarships for "the pursuit of devotional degrees . . . places a relatively minor burden on [the students]." *Locke*, 540 U.S., at 725.[3] Indeed, the Court noted that the Washington scholarship program in *Locke* (in contrast to the Colorado program here) "permits students to attend pervasively religious schools, so long as they are accredited," *id.* at 724, and even allows students to take "devotional theology courses" at state expense, so long as they are not pursuing a degree preparatory for the ministry. *Id.* at 725 & n.9.

The opinion thus suggests, even if it does not hold, that the State's latitude to discriminate against religion is confined to certain "historic and substantial state interest[s]," *id.* at 725, and does not extend to the wholesale exclusion of religious institutions and their students from otherwise neutral and generally available government support. The Court's language suggests the need for

---

[3] The Court also indicated that the prohibition on discrimination on the basis of religion continues to apply to funding programs that are forums for speech. *Locke*, 540 U.S. at 720 n.3 (distinguishing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)).

balancing interests: its holding that "minor burden[s]" and "milder" forms of "disfavor" are tolerable in service of "historic and substantial state interest[s]" implies that major burdens and categorical exclusions from public benefits might not be permitted in service of lesser or less long-established governmental ends. *Id.* at 720, 725.

We need not decide in this case whether such a balancing test is necessary or how it would be conducted, however, because the Colorado exclusion, in addition to imposing a far greater burden on affected students, has two features that were not present in *Locke* and that offend longstanding constitutional principles: the Colorado exclusion expressly discriminates *among* religions, allowing aid to "sectarian" but not "pervasively sectarian" institutions, and it does so on the basis of criteria that entail intrusive governmental judgments regarding matters of religious belief and practice. *See Larson v. Valente*, 456 U.S. 228, 246 (1982) (imposing strict scrutiny on governmental decisions that discriminate among religions); *NLRB v. Catholic Bishop*, 440 U.S. 490, 502–03 (1979) (discussing limitations on the power of the government to base decisions on intrusive questions regarding religious belief or practice).

*Locke* involved neither discrimination among religions nor intrusive determinations regarding contested religious questions. The scholarship program at issue in *Locke* excluded *all* devotional theology majors equally—without regard to how "sectarian" state officials perceived them to be—and therefore did not

discriminate among or within religions. *Locke*, 540 U.S. at 715–16. Evangelicals and Unitarians, Catholics and Orthodox Jews, narrow sectarians and freewheeling latitudinarians, all were under the same interdiction. And since under the program "[t]he institution, rather than the State, determine[d] whether the student's major [was] devotional," the State did not engage in intrusive religious inquiry. *Id.* at 717.

We therefore reject the argument of the state defendants and their *amici* that *Locke* compels affirmance in this case. Although *Locke* precludes any sweeping argument that the State may never take the religious character of an activity into consideration when deciding whether to extend public funding, the decision does not imply that states are free to discriminate in funding against religious institutions however they wish, subject only to a rational basis test.

The same may be said of *Eulitt ex rel. Eulitt v. Maine Department of Education*, 386 F.3d 344 (1st Cir. 2004), on which the state defendants also rely. *Eulitt* upheld a program providing tuition to private secular secondary schools but categorically excluding religious ones. We need not decide if we would have upheld the same program,[4] because Colorado's funding scheme raises

[4] *Eulitt* went well beyond the holding in *Locke*. Rather than declining to fund "particular categories of instruction," the State in *Eulitt* declined funding the entire program of education at the disfavored schools, based on their religious affiliation. *Id.* at 346–47; *cf. Locke*, 540 U.S. at 724–25 (noting that "[t]he program permits students to attend pervasively religious schools, so long as they are accredited," withholding its funding only from "the pursuit of devotional

(continued...)

constitutional problems not confronted there. The program at issue in *Eulitt*

excluded all religious schools without discriminating among them or (so far as

*Eulitt* discusses) using any intrusive inquiry to choose among them. *See id.* at

346–47. By contrast, Colorado's system does both.

## B. Discriminating Among and Within Religions

From the beginning, this nation's conception of religious liberty included,

at a minimum, the equal treatment of all religious faiths without discrimination or

preference. *See Wallace v. Jaffree*, 472 U.S. 38, 91–114 (1985) (Rehnquist, J.,

dissenting) (arguing that this was all that the Establishment Clause required);

Douglas Laycock, *"Nonpreferential" Aid to Religion: A False Claim About*

*Original Intent*, 27 Wm & Mary L. Rev. 875, 922–23 (1986) (arguing that the

First Amendment forbade both discrimination among religions and discrimination

for or against religion). When the First Amendment was written, at least ten of

the twelve state constitutional free exercise provisions required equal religious

treatment and prohibited denominational preferences. *See* Arlin M. Adams &

Charles J. Emmerich, *A Heritage of Religious Liberty*, 137 U. Pa. L. Rev. 1559,

1637–39 (1989) (collecting sources). James Madison made the point in his

---

[4](...continued)
degrees," thus "plac[ing] a relatively minor burden on [the students]"). The
Colorado exclusion challenged in this case is similar in its breadth to that in
*Eulitt*. As we have explained, because of other constitutional violations we need
not decide whether this aspect of the Colorado program would independently
render it unconstitutional.

famous *Memorial and Remonstrance*, criticizing a denominational preference for Christianity because it "violate[d] that equality that ought to be the basis of every law." James Madison, *Memorial and Remonstrance Against Religious Assessments* ¶ 4 (1785) *reprinted in* 5 *The Founders' Constitution* 82-84 (Philip B. Kurland & Ralph Lerner, eds., 1987). The First Amendment incorporates these values. Adams & Emmerich, *supra*, 137 U. Pa. L. Rev. at 1638. This is not to say that a generally applicable law is invalid simply because it has a different "incidental effect" on some religions than others. *See Employment Div. Dep't. of Human Res. of Or. v. Smith*, 494 U.S. 872, 878 (1990). But when the state passes laws that facially regulate religious issues, it must treat individual religions and religious institutions "without discrimination or preference," in the words of the New York Constitution of 1777, art. XXXVIII, *reprinted in* 5 *The Founders' Constitution*, at 75.

Many Supreme Court decisions have confirmed the principle. The Court has called neutral treatment of religions "[t]he clearest command of the Establishment Clause." *Larson v. Valente*, 456 U.S. 228, 244 (1982); *see also Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 707 (1994) ("It is clear that neutrality as among religions must be honored."). Such discrimination is forbidden by the Free Exercise Clause as well. *Larson*, 456 U.S. at 245 ("This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause");

*see also Lukumi*, 508 U.S. at 532–33; *Larson*, 456 U.S. at 246 (citing *Abington School District v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg J., concurring)). The Court has suggested that the Equal Protection Clause's requirement is parallel. *See Locke v. Davey*, 540 U.S. at 720 n.3 (citing *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974); *McDaniel v. Paty*, 435 U.S. 618 (1978)). In other words, "no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'" *Larson*, 456 U.S. at 246 (quoting *Everson v. Board of Education*, 330 U.S. 1, 15 (1947)). While CCU raises claims under three different constitutional clauses governing religious discrimination, all of them draw on these common principles. So while the Establishment Clause frames much of our inquiry, the requirements of the Free Exercise Clause and Equal Protection Clause proceed along similar lines.

By giving scholarship money to students who attend sectarian—but not "pervasively" sectarian—universities,[5] Colorado necessarily and explicitly discriminates among religious institutions, extending scholarships to students at some religious institutions, but not those deemed too thoroughly "sectarian" by governmental officials. The sole function and purpose of the challenged

---

[5] We recognize that the term "sectarian" imparts a negative connotation. *See Funk & Wagnalls New International Dictionary of the English Language* 1137 (comp. ed. 1987) (defining "sectarian" as meaning "[p]ertaining to a sect; bigoted."). We use it in this opinion because it is the statutory term; the Colorado legislature presumably used it because the Supreme Court did so at the time; the Supreme Court has not used the term in recent opinions except in quotations from earlier opinions or other sources.

provisions of Colorado law, Colo. Rev. Stat. §§ 23-3.5-105, 23-3.3-101(3)(d), and 23-3.7-104, is to exclude some but not all religious institutions on the basis of the stated criteria. Employing those criteria, the state defendants have decided to allow students at Regis University, a Roman Catholic institution run by the Society of Jesus, and the University of Denver, a Methodist institution, to receive state scholarships, but not students at CCU or Naropa University, a Buddhist institution. This is discrimination "on the basis of religious views or religious status," *Smith*, 494 U.S. at 877, and is subject to heightened constitutional scrutiny.

The Supreme Court has recently criticized the now-discarded doctrine that "pervasively sectarian" institutions could not receive otherwise-available education funding for discriminating in just this way. In *Mitchell v. Helms*, 530 U.S. 793 (2000), the plurality observed that "the application of the 'pervasively sectarian' factor collides with our decisions that have prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity." *Id.* at 828; *see also Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1342 (D.C. Cir. 2002) ("[A]n exemption solely for 'pervasively sectarian' schools would itself raise First Amendment concerns—discriminating between kinds of religious schools."). While Justice O'Connor did not join the plurality opinion in *Mitchell*, her separate opinion also refused to employ the pervasively-

-23-

sectarian distinction. *Mitchell*, 530 U.S. at 857–58 (O'Connor, J., joined by Breyer, J., concurring in the judgment).

The Fourth Circuit's decision in *Columbia Union College v. Oliver*, 254 F.3d 496 (4th Cir. 2001) (Wilkinson J.), is similarly instructive. There, the Court confronted the Maryland Higher Education Commission's refusal to provide funds to a college affiliated with the Seventh-day Adventist Church because the Commission had found it to be "a 'pervasively sectarian' institution" pursuant to Establishment Clause precedent. *Id.* at 498. Relying on the *Mitchell* plurality, the Fourth Circuit concluded that the pervasively sectarian test was unconstitutionally discriminatory and should be abandoned. *Id.* at 502–04. As Judge Wilkinson put it in his dissent in an earlier stage of the litigation, "[t]he denial of state aid to only certain types of religious institutions—namely, pervasively sectarian ones . . . directly violate[s] a . . . core principle of the Establishment Clause, the requirement of nondiscrimination among religions." *Columbia Union College v. Clarke*, 159 F.3d 151, 172 (4th Cir. 1998) (Wilkinson, J., dissenting).

In response to CCU's argument that the Colorado statute impermissibly discriminates among religions, the state defendants offer a puzzling and wholly artificial distinction: "Colorado's law," they say, "distinguishes not between types of religions, but between types of institutions." Appellees' Br. 51. "Any religious denomination," they say, "could establish a pervasively sectarian

-24-

institution, and any denomination could establish an educational institution that is not pervasively sectarian." *Id.* at 55.[6]  No doubt—just as any religion could engage in animal sacrifice or instruct its adherents to refrain from work on Saturday rather than Sunday.  *See Lukumi*, 508 U.S. at 524–25, 542, *Sherbert*, 374 U.S. at 399, 402–03.  The defendants supply no reason to think that the government may discriminate between "types of institution" on the basis of the nature of the religious practice these institutions are moved to engage in.

The defendants' argument is inconsistent with the leading case on denominational discrimination, *Larson v. Valente*, in which the Court invalidated a Minnesota statute imposing special registration requirements on any religious organization that did not "receive[] more than half of [its] total contributions from members or affiliated organizations."  456 U.S. at 231–32.  The statute discriminated against religions, like the Unification Church, that depend heavily on soliciting donations from the general public.  The Court did not suggest that the problem would go away because the Unification Church could change its fundraising methods, as our State defendants seem to suggest; the Court instead

_____

[6] The state defendants' brief also repeatedly mischaracterizes the Colorado law.  *See* Appellees' Br. 51 (claiming that the statute "merely distinguishes between secular and religious institutions"); *id.* at 55 (claiming that the statute distinguishes "between institutions that are sectarian and those that are not"); *id.* at 56 (stating that "states may distinguish between sectarian and non-sectarian institutions").  The issue is not whether the State can distinguish between sectarian and nonsectarian, or religious and secular, but whether it can distinguish among religious institutions, disadvantaging those the State deems "pervasively" sectarian.

held that the law was "not simply a facially neutral statute" because it "ma[de] explicit and deliberate distinctions between different religious organizations." *Id.* at 246 n.23.

The Colorado law seems even more problematic than the Minnesota law invalidated in *Larson*. The Minnesota law at least was framed in terms of secular considerations: how much money was raised internally and how much from outsiders to the institution. Here, the discrimination is expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations, as defined by such things as the content of its curriculum and the religious composition of its governing board. Although application of secular criteria does not invalidate a law even if there is a disparate impact, *see Children's Healthcare Is A Legal Duty, Inc., v. Min De Parle*, 212 F.3d 1084, 1092 (8th Cir. 2000), that logic will not save a law that discriminates among religious institutions on the basis of the pervasiveness or intensity of their belief.

Alternatively, the State defendants argue that discriminatory funding is permissible because the State is entitled to discriminate in spending legislation in ways that it could not if legislating directly. They rely on *Harris v. McRae*, 448 U.S. 297, 315–18 (1980), and *Maher v. Roe*, 432 U.S. 464 (1977), where the Supreme Court rejected the argument that decisions creating a constitutional right to an abortion required the State to "accord equal treatment to both abortion and childbirth" and therefore provide healthcare funding for abortion when such

funding was provided for childbirth. *Id.* at 470; *cf. Eulitt*, 386 F.3d at 354–55 (citing *Maher*). But the analogy is inapt. "The right to choose abortion is a right to be free of undue burdens; the right to religious liberty is a right to government neutrality." Laycock, *supra*, 118 Harv. L. Rev. at 177. The State is thus permitted "to make a value judgment favoring childbirth over abortion" (so long as any burden imposed is not undue), *Maher*, 432 U.S. at 474, but not one favoring some religions over others. As *Columbia Union* and *Mitchell* rightly conclude, the requirement of neutrality among religions applies to state aid just as much as to other laws. *Everson*, 330 U.S. at 15.

Finally, the state defendants argue that they may discriminate in favor of some religions and against others so long as their discrimination is not based on "animus" against religion—by which they mean religious "bigotry." Appellee's Br. 35–36 (citing *Locke*, 540 U.S. at 723 n.7). There is no support for this in any Supreme Court decision, or any of the historical materials bearing on our heritage of religious liberty. Even in the context of race, where the nondiscrimination norm is most vigilantly enforced, the Court has never required proof of discriminatory animus, hatred, or bigotry. The "intent to discriminate" forbidden under the Equal Protection Clause is merely the intent to treat differently. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738, 2773–74 (2007); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484–87 (1982) (discussing *Washington v. Davis*, 426 U.S. 229 (1976)); *Pers. Adm'r of*

*Mass v. Feeney*, 442 U.S. 256, 260, 273–74 (1979) (same). Similarly, the Court

has made clear that the First Amendment prohibits not only laws with "the object"

of suppressing a religious practice, but also "[o]fficial action that targets religious

conduct for distinctive treatment." *Lukumi*, 508 U.S. at 534; *see id.* at 533 (a law

is facially discriminatory "if it refers to a religious practice without a secular

meaning discernible from the language or context").[7]

To be sure, where governmental bodies discriminate out of "animus"

against particular religions, such decisions are plainly unconstitutional. But the

constitutional requirement is of government *neutrality*, through the application of

"generally applicable law[s]," not just of governmental avoidance of bigotry.

*Smith*, 494 U.S. at 881. If First Amendment protections were limited to

"animus," the government could favor religions that are traditional, that are

comfortable, or whose mores are compatible with the State, so long as it does not

act out of overt hostility to the others. That is plainly not what the framers of the

First Amendment had in mind.

---

[7] The section of the *Lukumi* opinion presenting evidence that the prohibition of animal sacrifice was based on hostility to the religion was joined by only two Justices. 508 U.S. at 540–42 (Kennedy, J., joined by Stevens, J.). *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234 n.16 (11th Cir. 2004) ("Under *Lukumi*, it is unnecessary to identify an invidious intent in enacting a law—only Justices Kennedy and Stevens attached significance to evidence of the lawmakers' subjective motivation.").

## C. Intrusive Religious Inquiry

Even assuming that it might, in some circumstances, be permissible for states to pick and choose among eligible religious institutions, a second line of Supreme Court precedents precludes their doing so on the basis of intrusive judgments regarding contested questions of religious belief or practice. As stated by the Court in *Mitchell v. Helms*: "[T]he inquiry into the recipient's religious views required by a focus on whether a school is pervasively sectarian is not only unnecessary but also offensive. It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." 530 U.S. at 828 (citing *Smith*, 494 U.S. at 887); *Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 414 n.2 (8th Cir. 2007) (joined by O'Connor, J.) (same); *see also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979) ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."); *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341–42 (D.C. Cir. 2002) (same).

Most often, this principle has been expressed in terms of a prohibition of "excessive entanglement" between religion and government. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 232–35 (1997); *NLRB v. Catholic Bishop*, 440 U.S. at 499, 502. The anti-entanglement rule originated in the context of education, changing

with re-interpretations of the famous doctrine of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), although it has migrated to other contexts. *See, e.g.*, *Rweyemamu v. Cote*, 520 F.3d 198, 208–09 (2d Cir. 2008) (Title VII of the Civil Rights Act unconstitutional as applied to ordained priest); *Schleicher v. Salvation Army*, 518 F.3d 472, 474, 477–78 (7th Cir. 2008) (Fair Labor Standards Act presumptively excepts "clerical personnel"). At first the prohibition on entanglements was formulated as an independent requirement of the Establishment Clause, later as one element of determining the "effect" of the law in advancing or inhibiting religion. *Agostini*, 521 U.S. at 232–33; *see also Zelman v. Simmons-Harris*, 536 U.S. 639, 668–69 (O'Connor, J., concurring) (discussing history of the "entanglement inquiry."). Properly understood, the doctrine protects religious institutions from governmental monitoring or second-guessing of their religious beliefs and practices, whether as a condition to receiving benefits (as in *Lemon*) or as a basis for regulation or exclusion from benefits (as here). *See* Carl H. Esbeck, *Establishment Clause Limits on Governmental Interference with Religious Organizations*, 41 Wash. & Lee L. Rev. 347, 397 (1984).

The Colorado provisions challenged here are fraught with entanglement problems. The most potentially intrusive element of the Colorado statute is the criterion requiring Commission staff to decide whether any theology courses required by the university "tend to indoctrinate or proselytize." Colo. Rev. Stat. § 23-3.5-105(1)(d). To apply this criterion, the Commission demanded to see

syllabi from theology courses at CCU. The record contains two syllabi for "Early Christian Literature," a course studying "the New Testament as literature." App. 273. In these courses, the students are asked, for example, to give "big ideas" of all of the books of the New Testament, and "explain how the differences in the various gospels reflect the different theological concerns of the various writers." App. 279, 284. The Commission concluded that the course failed the statutory criterion, although it did not explain why. All we know is that one official defined the term "indoctrinate" to mean "to try and convince, to try and convert, to try and get individuals to subscribe to a particular set—to whatever the subject is, in this case, a theological subject or religious subject," and "proselytize" to mean "to evangelicize (sic), to do more than just educate but to advocate that an individual subscribe to a certain theological point or religious point." App. 102–03, ¶ 79. To decide that these syllabi were likely "to convince" the students of religious truths, the Commission had to decide how religious beliefs are derived and to discern the boundary between religious faith and academic theological beliefs.

Such inquiries have long been condemned by the Supreme Court. In *New York v. Cathedral Academy*, 434 U.S. 125 (1977), for example, the Supreme Court considered a state statute that reimbursed private religious schools for the costs of in-class examinations and other state-mandated teaching activities only if they were devoid of religious content. The Court held the process of examining the

schools' teaching practices for religious content unconstitutional, explaining that "this sort of detailed inquiry into the subtle implications of in-class examinations and other teaching activities would itself constitute a significant encroachment on the protections of the First and Fourteenth Amendments." *Id.* at 132. The Court pointed out that "[i]n order to prove their claims for reimbursement, sectarian schools would be placed in the position of trying to disprove any religious content in various classroom materials" and the court "would be cast in the role of arbiter of the essentially religious dispute." *Id.* at 132–33. The Court concluded, in words equally applicable to the Colorado statute: "The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment." *Id.* at 133.

More recently, in *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), the Court rejected the argument, put forth by the dissent, that a public university must refrain from extending the benefits of a neutral subsidy to a student publication that contained religious "indoctrination" and "evangelis[m]," as opposed to "descriptive examination of religious doctrine." *Id.* at 867, 876, 877 (Souter, J., dissenting) (internal quotation marks omitted). That proposal is similar to the line drawn by the Colorado statute. The majority rejected this idea, noting that "it would require the University . . . to scrutinize the content of student speech, lest the expression in question . . .

-32-

contain too great a religious content." *Id.* at 844. "That eventuality," the Court stated, "raises the specter of governmental censorship," which "would be far more inconsistent with the Establishment Clauses's dictates than would governmental provision of [assistance] on a religion-blind basis." *Id.* at 844–45.

The same "specter of government censorship" is present in this case, except that it has actually materialized. Commission officials testified that they demanded to see CCU's religious education curriculum, and (for reasons known only to themselves) determined that it "tend[ed] to indoctrinate or proselytize." App. 103 ¶ 79. The line drawn by the Colorado statute, between "indoctrination" and mere education, is highly subjective and susceptible to abuse. Educators impart information and perspectives to students because they regard them as true or valuable. Whether an outsider will deem their efforts to be "indoctrination" or mere "education" depends as much on the observer's point of view as on any objective evaluation of the educational activity. Anyone familiar with the varied reactions to the New York Times and FOX News knows how often assessments of objectivity and bias depend on the eye of the beholder. Many courses in secular universities are regarded by their critics as excessively indoctrinating, and are as vehemently defended by those who think the content is beneficial. Such disagreements are to be expected in a diverse society. But when the beholder is the State, what is beheld is the exercise of religion, and what is at stake is the right of students to receive the equal benefits of public support for higher

-33-

education, the Constitution interposes its protection. The First Amendment does not permit government officials to sit as judges of the "indoctrination" quotient of theology classes.

A second statutory criterion presenting serious entanglement concerns is that "[t]he governing board does not reflect nor is the membership limited to persons of any particular religion." Colo. Rev. Stat. § 23-3.5-105(1)(e). As authoritatively interpreted by the Colorado Supreme Court in *Americans United for Separation of Church and State Fund v. Colorado*, 648 P.2d 1072 (Colo. 1982), this provision requires state officials to examine the educational policies of the governing board and match them against the officials' understanding of the religious doctrine. There, the court confronted an argument by Regis, a Catholic college (it is now a university), that it satisfied this criterion because only a majority, and not all, of its trustees were required to be Jesuits. *Id.* at 1087–88 n.14. The court responded that this was not enough, because the university was also required to show that its board did not "reflect" a particular religion:

> To "reflect" is to give back an image or likeness of an object or condition. . . . Of particular importance are the procedures employed by the governing board in its decision-making process and the fruits of that process. The record here does not permit a determination, for the purpose of summary judgment, that the Regis Board of Trustees does not give back an image or likeness of a particular religion in its policies and decisions pertaining to the educational function of the institution. Further evidentiary development of this issue is necessary.

*Id.* at 1088.

-34-

This inquiry goes not just to "decision-making process" but to substance, (*i.e.* "the fruits of that process").  To perform the substantive inquiry and decide whether a university's governing board complies with the statute, state officials must look at the "policies and decisions" of the board and see whether those policies have "the image or likeness of a particular religion."  *Id.*  We do not see how the state can constitutionally do this.  It is not for the state to decide what Catholic—or evangelical, or Jewish—"polic[y]" is on educational issues.  That is a question of religious doctrine on which the State may take no position without entangling itself in an intrafaith dispute.  Asking whether a university's educational policy on a given issue has "the image or likeness of a particular religion," *id.*, is thus unconstitutional.

This form of inquiry was rejected by the Supreme Court in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979).  There, the Court reversed the NLRB's "assertion of jurisdiction over teachers in religious school[]," explaining that such oversight would create "excessive entanglement" with the schools' religious views.  *Id.* at 499, 502.  The entanglement would occur whenever a school claimed that its "challenged actions were mandated by [its] religious creeds."  *Id.* at 502.  Resolving this claim would "necessarily involve inquiry into . . . [the] relationship [of the actions] to the school's religious mission."  *Id.*  This "very process of inquiry," the Court held, "may impinge on rights guaranteed by

-35-

the Religion Clauses," and "presents a significant risk that the First Amendment will be infringed." *Id.*

In *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002), a similar NLRB inquiry was again rejected. After *Catholic Bishop*, the NLRB granted a religious exemption to the National Labor Relations Act only when it was satisfied that a school had "a religious mission," an issue on which it conducted its own inquiry. *Id.* at 1340 (internal citations omitted). After the NLRB concluded that the University of Great Falls—despite its own claims to the contrary—did not have a religious mission, the D.C. Circuit held this inquiry impermissible under *Catholic Bishop*. *Id.* at 1341–44. Under the NLRB's new test, the University president was called before the government and asked to explain the school's curricular and policy choices and policies and "respond to doubts that [they were] legitimately 'Catholic.'" *Id.* at 1343. "This is the *exact* kind of questioning into religious matters which *Catholic Bishop* specifically sought to avoid," the D.C. Circuit held, *id.*, and it is the exact kind of questioning required by the Colorado statute. It is no business of the State to decide what policies are entailed by or "reflect" the institution's religious beliefs.

The First Circuit's decision in *Surinach v. Pesquera De Busquets*, 604 F.2d 73 (1st Cir. 1979), further demonstrates the problem. Relying on *Lemon* and *Catholic Bishop*, the court held it unconstitutional for the Commonwealth of Puerto Rico "to investigate the operating costs of Roman Catholic schools in the

Commonwealth" in order to enforce local price controls. *Id.* at 73–75. Under the regulatory scheme, the Commonwealth was required to decide in some cases how money "should best be allotted to serve the religious goals of the schools." *Id.* at 79. As the First Circuit held, this judgment was not the government's to make. Moreover, because of the illegitimacy of these purposes, the "compelled disclosure" itself was unconstitutional because of its "potential . . . chilling of the decision making process." *Id.* at 78.

Three of the six statutory criteria involve yet another entanglement problem. Colo. Rev. Stat. § 23-3.5-105(1)(a), (e), (f). Each of them prohibits the institution from having students, faculty, trustees, or funding sources that are "exclusively," "primarily," or "predominantly," of "one religious persuasion" or of a "particular religion." This requires government officials to decide which groups of believers count as "a particular religion" or "one religious persuasion,"[8] and which groups do not. That requires them to wade into issues of religious contention. In answering the Commission's questionnaire, CCU stated that its students, faculty, and trustees are not of a single religion, because the school is an interdenominational institution; it "unites with the broad, historic evangelical faith rather than affiliating with any specific denomination." App. 88, ¶ 21. The state defendants took a different view: to them, all Christians are of the same religious

_____

[8] We are unable to figure out why the statute employs these two different expressions for what appears to be the same thing.

-37-

persuasion, and denominational distinctions do not matter. The "correct" answer to that question depends on one's ecclesiology. But under the First Amendment, the government is not permitted to have an ecclesiology, or to second-guess the ecclesiology espoused by our citizens. "Courts are not arbiters of scriptural interpretation." *Thomas v. Review Bd. Ind. Employment Sec. Div.*, 450 U.S. 707, 716 (1981).

The State defendants blithely assumed that they could lump together all "Christians" as a single "religion." But the definition of who is a "Christian" can generate an argument in serious circles across the country. Some students at CCU are members of the Church of Jesus Christ of Latter-Day Saints, or "Mormons." Members of the LDS Church stoutly insist that they are Christians, but some Christians, with equal sincerity and sometimes vehemence, say they are not. In order to administer Colorado's exclusionary law, government officials have to decide which side in this debate is right. Similar questions plague the religious taxonomy of Jehovah's Witnesses, Christian Scientists, Unitarian-Universalists, various syncretistic groups and even (in some circles) the Roman Catholic Church.

To make matters worse, the Commission has (no doubt without animus) applied different standards to different religious traditions. When confronted with the question of whether Regis College was eligible for student scholarships, the Commission (and later the Colorado Supreme Court) focused on the particular denomination, which is Roman Catholicism, and concluded that the institution was

eligible. In CCU's case, however, the Commission focused on a broader category: all Christians. Logic tells us that the broader the category deemed "a particular religion" the more difficult it will be for an institution to qualify. Thus, the Commission's choice of the level of analysis made it more likely that a broadly interdenominational institution like CCU, whose students, faculty, and trustees adhere to a range of churches, would be deemed "pervasively sectarian," while an institution operated by a single denomination (indeed, a single religious order within the denomination) would not.

Also troublesome is the provision regarding mandatory attendance at religious "convocations or services." Colo. Rev. Stat. § 23-3.5-105(1)(b). The record is sparse regarding how the Commission interprets this provision. What counts as a "religious convocation or service"? Would this include celebration of the mass at graduation ceremonies? Does it matter if the student is required to attend, but not required to partake of the sacrament? *Cf. Lee v. Weisman*, 505 U.S. 577, 592–96 (1992) (reflecting on the meaning of "coercion" in the context of graduation prayers). What counts as "mandatory" attendance? What if the student is permitted to satisfy the obligation by attendance at a worship service of his own choosing? And what if (as is evidently true at CCU) some but not all students are required to attend? Would an entire student body be rendered ineligible if the institution had, for example, a graduate seminary for whose students attendance was required? These determinations threaten to embroil the government in line-

drawing and second-guessing regarding matters about which it has neither competence nor legitimacy.

The final criterion is whether the institution has a "strong commitment to principles of academic freedom." Colo. Rev. Stat. § 23-3.5-105(1)(c). A majority of the Commission officials determined that CCU satisfied this criterion, on the basis of its adoption of the "1940 Statement of Principles of Academic Freedom of the American Association of University Professors." App. 90, ¶ 27. This can be seen as a form of self-definition, and therefore as less intrusive and entangling than the others. But even as to this criterion, one Commission official stated he was "not satisfied" and questioned whether CCU's stated commitment to academic freedom could be squared with the statement of religious beliefs it required of faculty and governing board members. App. 102, ¶ 78. If that sort of second-guessing were permitted, state officials would be in a position of examining statements of religious beliefs and determining whether those beliefs are, or are not, consistent with scholarly objectivity. Such determinations would seem to be an excessive entanglement and intrusion into religious affairs.

The state defendants respond that all of these inquiries are justified by *Locke v. Davey*, because determining whether a theology program is "devotional" is just as intrusive as determining what a single "religion" is, whether classes "indoctrinate," and what educational policies "reflect" a religion. This misses a crucial point in *Locke*: the Court explicitly pointed out that "[t]he institution,

rather than the State, determines whether the student's major is devotional." 540 U.S. at 717. This avoided the intrusiveness problem; the State made no contentious religious judgments, but simply deferred to the self-evaluation of the affected institutions. Unlike Washington, Colorado insists on second-guessing an institution's characterization of its own religious nature. The Commission refused even to accept CCU's assessment of what religions were entailed by its own statement of faith. We do not mean to say that states must allow universities to be the final judge of their own eligibility for state money—of course not. However, if the State wishes to choose among otherwise eligible institutions, it must employ neutral, objective criteria rather than criteria that involve the evaluation of contested religious questions and practices.

### D. Governmental Interest

Having identified these constitutional problems with the Colorado statute, there remains the issue of governmental interest. Violations of the Equal Protection and Free Exercise Clauses are generally analyzed in terms of strict scrutiny, under which discrimination can be justified only if it is narrowly tailored to achieve a compelling state interest. *E.g.*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738, 2751–52 (2007); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546–47 (1993). Establishment Clause violations, by contrast, are usually flatly forbidden without reference to the strength of governmental purposes. *E.g.*, *Presbyterian Church v. Hull*, 393 U.S.

-41-

440, 449–52 (1969); *Lemon v. Kurtzman*, 403 U.S. 602, 612–14, 625 (1971).

*Larson v. Valente,* alone among Establishment Clause cases, looked to whether the challenged law survives strict scrutiny rather than simply declaring it unconstitutional. 456 U.S. at 246. From this we conclude that statutes involving discrimination on the basis of religion, including interdenominational discrimination, are subject to heightened scrutiny whether they arise under the Free Exercise Clause, *Lukumi*, 508 U.S. at 546, the Establishment Clause, *Larson*, 456 U.S. at 246, or the Equal Protection Clause, *Locke*, 540 U.S. at 720 n.3 (citing *McDaniel v. Paty*, 435 U.S. 618 (1978)), while those involving other Establishment Clause issues, such as excessive entanglement, are unconstitutional without further inquiry. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) ("*Larson* indicates that laws discriminating *among* religions are subject to strict scrutiny.")

As already discussed, *Locke v. Davey* introduces some uncertainty about the level of scrutiny applicable to discriminatory funding. The majority opinion refrained from stating what level of scrutiny it was applying to Joshua Davey's First Amendment claim, but dropped two hints that the proper level of scrutiny may be something less than strict. First, the Court noted that discrimination in funding is a "milder" form of "disfavor" than the imposition of criminal or civil sanctions, which may suggest that a lesser governmental interest is required to justify it. 540 U.S. at 720. Second, the Court characterized the government's

interest in *Locke* as "historic and substantial." *Id.* at 725. While considerably more demanding than rational basis, this likely falls short of requiring that the government's interest be "compelling." On the other hand, as we have noted, *Locke* did not involve discrimination among religions, and the Court may not have intended the new lower standard (if that is what it is) to apply to cases of this sort. Fortunately, we need not decide precisely what level of scrutiny applies to the denominational discrimination in this case, because the State scarcely has any justification at all.

In *Americans United for Separation of Church and State Fund v. Colorado*, 648 P.2d 1072, 1075 (Colo. 1982), the Colorado Supreme Court described the "pervasively sectarian" exclusion as "an attempt to conform to First Amendment doctrine." That accords with what is known of the legislative history. The legislature framed these statutes to make funds as broadly available as was thought permissible under the Supreme Court's then-existing Establishment Clause doctrine. *Id.* at 1075 n.1. The sponsor of the bill described the six criteria as an "inclusive" attempt to conform to Supreme Court decisions and avoid "interesting lawsuits." *Id.* (quoting Sen. Fowler). Even at the time (1977), it is not clear that a religiously affiliated university would have had to satisfy all six of the legislative criteria to be eligible for public funding under the Establishment Clause,[9] but it

_____

[9] To the extent the Court examined factors similar to the ones outlined in the Colorado statute, it applied a holistic approach rather than insisting that

(continued...)

has become clear in the intervening years that exclusion of institutions like CCU is in no way necessary for compliance with the Establishment Clause. In light of the changes in the Supreme Court's First Amendment jurisprudence, the original purpose of the exclusion provisions has been rendered obsolete; there apparently was no other.

The district court held that the purpose of the exclusion was to comply with Colo. Const. Art. IX § 7, which provides:

> Neither the general assembly, nor any county, city, town, township, school district or other public corporation, shall ever make any appropriation, or pay from any public fund or moneys whatever, anything in aid of any church or sectarian society, or for any sectarian purpose, or to help support or sustain any school, academy, seminary, college, university or other literary or scientific institution, controlled by any church or sectarian denomination whatsoever; nor shall any grant or donation of land, money or other personal property, ever be made by the state, or any such public corporation to any church, or for any sectarian purpose.

---

[9](...continued)
institutions satisfy every factor. *See generally Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736, 755–761 (1976); *Tilton v. Richardson*, 403 U.S. 672, 686–87 (1971) (plurality). In fact, the Supreme Court never found an accredited college or university "pervasively sectarian." The Court appeared to use the concept as a rationale for distinguishing between primary schools and higher education. *See* Frederick M. Gedicks, *The Rhetoric of Church & State: A Critical Analysis of Religion Clause Jurisprudence* 85–88 (1995). Moreover, by 1977 there was dictum that a program of "indirect" aid through broad-based scholarships, akin to the "G.I. Bill," would satisfy the Court's Establishment concerns. *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 782 n.38 (1973). This ripened into a holding of the Court in *Mueller v. Allen*, 463 U.S. 388, 390–91 (1983).

That, however, must be mistaken. The Colorado Supreme Court has interpreted Art. IX § 7 as applying to direct subsidies to the religious institutions themselves, not to scholarships to students. In *Americans United*, the court upheld the scholarship programs at issue here against state constitutional challenge on the basis of the indirect nature of the aid, the higher-education context, and the availability of the aid to students at both public and private institutions. *Americans United*, 648 P.2d at 1083–84. Because "the aid is designed to assist the student, not the institution," *id.* at 1083, the Colorado Supreme Court would likely uphold the program even if CCU were admitted.[10] *Cf.* Op. Colo. Atty. Gen. No. 05-03, 2005 WL 4020085 (July 29, 2005) (holding that Colo. Const. Art. X, §20 imposes lesser restraints on indirect than direct aid). And if money given to college students who choose religious colleges were some day held to violate Article IX, the "pervasively sectarian" distinction would not save it, because Article IX applies to all colleges and universities "controlled by any church or sectarian denomination whatsoever," and makes no distinction among religious institutions on the basis of the pervasiveness of their sectarianism. The

---

[10] The State defendants rely heavily on a brief statement in *Americans United* that the criteria "militate[d] against the type of ideological control over the secular educational function which Article IX, Section 7, at least in part, addresses." *Id.* at 1084. But we do not think the court suggested that the pervasively-sectarian exclusion was *necessary* for the scholarship programs to comply with the state constitution, nor can we see why the Colorado Constitution would be read to impose such a requirement.

exclusionary provisions of the statute are therefore a square peg with respect to the state constitutional round hole.

The defendants also contend that, apart from its constitution, the State of Colorado has a compelling interest in keeping taxpayers from supporting students who choose religious education. The defendants provide no evidence that this is so, and the legislative history and state court interpretation are to the contrary. The evidence shows that the sponsors of the legislation attempted to provide student scholarships on as "inclusive" a basis as was then deemed permissible. We cannot and will not uphold a statute that abridges an enumerated constitutional right on the basis of a factitious governmental interest found nowhere but in the defendants' litigating papers. But even if saving taxpayers from supporting students who choose a religious education were an actual state interest, it would still fail because the statute is not narrowly tailored to this asserted goal. Under the challenged provisions, Colorado does not stop students from taking scholarship money to religious universities—it stops them only from taking scholarship money to a narrow set of them that state officials regard as too pervasively so. This underinclusiveness undermines the defendants' claim of narrow tailoring. *See United States v. Friday*, 525 F.3d 938, 958 (10th Cir. 2008) ("Underinclusive[ness] . . . suggests that the government's 'supposedly vital interest' is not really compelling.") (internal quotation marks omitted).

As best we can tell, the State's *actual* interest in enacting the statute was to award scholarships to deserving students as universally as federal law permits. That purpose is not served by excluding CCU. Accordingly, on any plausible level of scrutiny, the discriminatory nature of the exclusion provisions cannot be justified by reference to an "historic and substantial state interest." *Locke*, 540 U.S. at 725.

### III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of the State must be reversed. CCU also appeals the denial of summary judgment in its favor. *See Yaffe Cos. v. Great Am. Ins. Co.*, 499 F.3d 1182, 1184 (10th Cir. 2007) ("An order denying summary judgment is reviewable when it is coupled with a grant of summary judgment to the opposing party.") (internal quotation marks and alterations omitted.). Because we have held that the challenged statutes violate the First Amendment and have no constitutionally sufficient justification, CCU is entitled to summary judgment for the same reasons the State defendants were not.

The district court's order granting the State's motion for summary judgment and denying CCU's is therefore **REVERSED**, and the case is **REMANDED** to the district court to enter summary judgment in favor of CCU and to determine the appropriate remedy.