Peter KINTZELE, Charles A. Neighbors, and Marion Laheist, Appellants,

v.

CITY OF ST. LOUIS, Missouri, Raymond R. Tucker, Mayor of the City of St. Louis, Missouri, et al., Respondents.

No. 48500.

Supreme Court of Missouri,

En Banc.

June 12, 1961.

Rehearing Denied July 10, 1961.

Boyle G. Clark, Columbia, Harry C. Avery, St. Louis, Raymond C. Lewis, Jr., Smith & Lewis, Columbia, for appellants.

Irvin Dagen, Edward C. Cody, St. Louis, for respondents Land Clearance for Redevelopment Authority of the City of St. Louis: Eugene C. Farrell, Howard B. Woods, Samuel H. Liberman, Herman Willer and D. Richard Adams, Commissioners, and C. L. Farris, as Executive Director of Land Clearance for Redevelopment Authority of the City of St. Louis.

R. H. McRoberts, T. V. Connelly, St. Louis, for defendant-respondent, St. Louis University.

Bryan, Cave, McPheeters & McRoberts, St. Louis, of counsel.

Thomas J. Neenan, City Counselor, Eugene P. Freeman, Associate City Counselor, St. Louis, for stated respondents.

HYDE, Chief Justice.

This is a taxpayers' action for declaratory judgment and injunction, involving the Mill Creek Valley Redevelopment Plan (hereinafter called "Plan") of the City of St. Louis (hereinafter called "City") and its Land Clearance for Redevelopment Authority (hereinafter called "Authority") and particularly the sale of land therein to St. Louis University (hereinafter called "University"). The trial court refused to make the declarations sought by plaintiffs, declaring the sale illegal and void, and refused to enjoin the sale; but instead entered a decree with declarations in favor of defendants' contentions, denying an injunction, and finding all issues in favor of defendants.

Plaintiffs' claims of error amount to two main contentions, namely: that the sale constituted an unconstitutional use of public power and public funds in aid of a private sectarian school controlled by a religious denomination; and that the sale constituted an unconstitutional taking of private and public property for private use and an abuse of the power of eminent domain.

These contentions are based on the following claims which plaintiffs say the evidence clearly showed and the court should have found:

"a. that the Authority designated and limited the use of said land for the University prior to approval of the Redevelopment Plan and prior to the necessary statutory public advertisements;

"b. that the Authority considered and accepted the redevelopment proposal of the University prior to the acquisition and clearance of the land;

"c. that the Authority failed to properly and legally advertise for other proposals and that such advertisements were necessary for the exercise of Authority's power; and

"d. that the Authority failed to give bona fide consideration to other proposals as required by law and discouraged and misinformed other redevelopers and potential redevelopers by publication of the Redevelopment Plan and other maps showing said exclusive designation and limitation, and by information furnished to interested parties."

Plaintiffs also say that the sale was not made at fair value because the value fixed by the authority was not in accordance with a standard authorized by law; and that the vacation of a certain public plaza, in the tract conveyed to University, by ordinance of City, constituted a direct, illegal and unconstitutional contribution of public lands to University. Plaintiffs point out that this is an appeal from a judgment and decree in equity and should be heard and considered de novo, citing McCarty v. McCarty, Mo.Sup., 300 S.W.2d 394; see also Rule 73.01, V.A.M.R.

The facts hereinafter stated appear from the testimony and exhibits in the record. By ordinance of City in 1952 existence of blighted areas was found and Authority was established. In 1954, the Mill Creek area of about 460 acres, west of the central business district was declared blighted and planning by Authority authorized by ordinance, with necessary findings for assistance by the federal government. The first redevelopment project had been on the Plaza from the Union Station to the east. The Mill Creek project was from the Union Station to the west. A special election, on May 26, 1955, provided for bonds to pay City's share of the Mill Creek project. On December 27, 1955, City and Authority made a contract providing for certain services to be rendered by City in connection with the Mill Creek project and on March 26, 1958, City approved by ordinance the Redevelopment Plan and ordered execution of a cooperation agreement defining City's obligations. In Sep-

tember 1957, Authority advertised generally for proposals for development and a public hearing was held on the redevelopment plan on March 17, 1958, at which proposals were invited. There were other advertisements in March 1959 requesting proposals on the land herein involved and other land.

The north boundary of the Mill Creek project was Olive Street and Lindell Boulevard from 20th Street to Grand Boulevard, which was its west boundary. In developing its Plan, Authority had studied land uses for a distance of one mile beyond these boundaries. St. Louis University, founded in 1818, by the Jesuit Order of the Catholic Church, chartered as a nonprofit educational corporation, had its main campus on the west side of Grand south of Lindell and needed land for expansion. University was interested in the land on the east side of Grand and before the Mill Creek project was commenced, it already had about one acre east of Grand on which there was a building called Champlin Hall. In 1953, it had a New York firm make a study of its needs and later of its financial possibilities. In 1954, after City by ordinance found the Mill Creek area blighted, University's architects began studies of land use, which included the land herein involved. Soon after the bonds were voted in 1955, University prepared a brochure indicating its future plans including the land in the Mill Creek area in which it was interested. However, its statement only expressed hope of acquiring land in the Mill Creek area. Articles about these plans appeared in St. Louis newspapers. Authority began negotiations with private redevelopers during that year. In 1956, Authority issued Land Use Plans, Preliminary Project Report and maps of the area, in which some land was designated as "Public or Semi-Public," and University's proposed campus addition was listed under that heading. The words "St. Louis University" appeared across that designated area on maps. Later maps had the words "University expansion" on

that area. The first re-use appraisals were made during that year. In 1957, there was correspondence between University and Authority officers which resulted in a "letter of intent" being sent by University to Authority. (Defendants' explanation of a letter of intent was that it was intended to demonstrate to the federal agency, furnishing two-thirds of the cost, the interest of a possible redeveloper and that it did not obligate anyone.) In June 1958, the Loan and Grant Contract between Authority and the federal agency was executed and Authority began its purchase of land. In December 1958, University received a gift of sufficient amount to purchase the land in which it was interested, which it claimed for the first time gave it sufficient finances to participate. After the March 1959 advertising by Authority, University submitted a proposal to purchase, which was approved by the federal agency in July 1959. This suit was filed in August 1959 and the purchase contract between University and Authority was executed in January 1960.

Plaintiffs and others were members of organizations opposing the sale of land by Authority to sectarian institutions. Representatives of these organizations conferred with officers of Authority in December 1957. Their testimony was they were told that the land involved was to be used to expand St. Louis University; that no one else would have a chance to acquire that tract; that giving other institutions a chance to acquire it would be "spinning their wheels"; and that St. Louis University was considered a public institution in the same category as the University of Missouri. These statements were denied by Authority's officers. These representatives, of the organizations, with which plaintiffs are affiliated, attended the public hearing on the plan on March 17, 1958, and stated their opposition to any sale to University. Plaintiffs also had testimony of a representative of Gulf Oil Company that he was told land acquired by that company could not be kept by it because Authority would develop the whole area and the tract in which he was interested

would be used for University or institution-al uses. (He was not sure which term was used.) Authority's version was that he was told it would be subject to the land use provided in the final Redevelopment Plan.

Defendants' evidence was that the maps, charts and correspondence between University and Authority offered by plaintiffs showed only tentative planning, subject to negotiation with any interested redevelopers. Most of the 21½ acre tract later purchased by University was designated "public and semi-public with residential permitted as an alternate use"; and the rest was designated as "public and semi-public with commercial permitted as an alternate use." Re-use valuations were based on these alternate uses. These designations were used for churches, the Y.M.C.A., schools and public buildings, in the Mill Creek area, and had been used in the Plaza area. In that project a Methodist Church and Catholic Church had been sold adjoining land for expansion. It was shown that the words "semi-public" are words of art used by planners (including the City Plan Commission and the writers of the Federal Manual used in redevelopment projects) to indicate such uses as hospitals, schools, churches and other institutions not publicly owned but which serve the public. University is open to all qualified students without restrictions of race, color or creed. Defendants' evidence was that University's plans were only tentative at all times before its 1959 proposal to purchase and that Authority made no commitment or decision that the land would be sold to University for educational purposes instead of being sold for its alternate uses until after that time. Other facts will be hereinafter stated.

The trial court made the following findings (among others) in its decree, namely, that defendants did not set aside the land involved as a site for the University's campus; that defendants' actions did not deprive others of the right to bid for said land and did not limit the sale thereof to University; that the price to be paid by University was not less than the fair value of the land; that there was no advantage given to University in the sale of the land; that the Redevelopment Plan did not limit the use of the land to University; that the sale was made by Authority pursuant to due observance of all applicable requirements of law, without fraud, bad faith, caprice or misconduct of Authority or University and involved no preference or favoritism; and that failure to recognize the purchase contract would amount to discrimination against University.

■ Plaintiffs make no claim that the Redevelopment Law (Chap. 99 RSMo, V.A.M.S.) is unconstitutional, and this eliminates any issue as to public purpose of the project. See State on Inf. of Dalton v. Land Clearance for Redevelopment Authority of Kansas City, Missouri, 364 Mo. 974, 270 S.W.2d 44; Land Clearance for Redevelopment Authority of City of St. Louis v. City of St. Louis, Mo.Sup., 270 S.W.2d 58. Plaintiffs' actual basic claim is that University was illegally designated to get the land involved from the inception of the project and that no one else was given an opportunity to acquire it. Plaintiffs say this was use of public power and public funds in aid of a private sectarian school in violation of Secs. 5, 6 and 7 of Art. I and Sec. 8 of Art. IX of the Missouri Constitution, V.A.M.S., and the First and Fourteenth Amendments to the Constitution of the United States, citing Everson v. Board of Education of Ewing Township, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711; Berghorn v. Reorganized School District No. 8, Franklin County, 364 Mo. 121, 260 S.W.2d 573; Harfst v. Hoegen, 349 Mo. 808, 163 S.W.2d 609, 141 A.L.R. 1136; McVey v. Hawkins, 364 Mo. 44, 258 S.W.2d 927, none of which consider redevelopment projects. Plaintiffs say the total cost of acquisition and clearing of the land sold to University for $535,800 was $1,624,617. While they recognize that the "redevelopment law generally contemplates a difference between acquisition cost and re-use value," they say "in this case, the

designation and limitation of the use of the land was made illegally and prematurely by the Authority in excess of its powers, by unreasonable, arbitrary and illegal action, and by abuse of the power of eminent domain." Plaintiffs say that University was treated as a "public body" under the statute although it is, in fact, a private sectarian school controlled by a religious denomination. As hereinabove shown, the trial court found against plaintiffs on the essential fact issues as to illegal designation and our conclusion is that its findings are not clearly erroneous but instead are properly based on credibility of witnesses and are supported by substantial evidence on the whole record. Therefore, we will rule this case on the basis of the trial court's findings.

■ The New York Court of Appeals ruled a similar situation in 64th St. Residences, Inc. v. City of New York, 4 N.Y.2d 268, 174 N.Y.S.2d 1, 4, 150 N.E.2d 396, certiorari denied 357 U.S. 907, 78 S.Ct. 1152, 2 L.Ed.2d 1157. See also 10 Misc.2d 841, 173 N.Y.S.2d 700. In that case, involving a sale to Fordham University, the court said: "Plaintiffs say that the condemnation of this land and the sale thereof to the university is completely void because Fordham is a denominational school and the sale to it, according to plaintiffs, at $7 per square foot of land for which the city will pay an estimated cost of about $16 per square foot would thus be an unconstitutional grant or subsidy of public moneys to a religious corporation. The argument, however, proceeds on an assumption false in fact. Plaintiffs say that because the city arranged to sell this land at a price much below what the city will pay for it, this necessarily amounts to a subsidy or gift. But what the city is buying is not the same as what Fordham is buying. The city buys land and buildings. Fordham buys the same property but subject to its agreement to raze the buildings, relocate the tenants and use the cleared land for a collegiate campus and buildings only. What Fordham is paying for is the re-use value of the land. There is in this record no dispute of the fact, found by both courts below, that the $7 per square foot which Fordham agreed to bid, and did bid, is at least equal to the re-use value as established by several appraisals, all of which reported figures lower than $7 per square foot. Therefore, there is no substance to the assertion, on which this whole suit depends, that Fordham is getting a gift, grant or subsidy of public property." The court also pointed out: "[S]ince this sale is an exchange of considerations and not a gift or subsidy, no 'aid to religion' is involved and a religious corporation cannot be excluded from bidding." See also Kaskel v. Impellitteri, 306 N.Y. 73, 95, 115 N.E.2d 659, 670; Boro Hall Corporation v. Impellitteri, 283 App.Div. 889, 130 N.Y.S.2d 6, appeal dismissed 307 N.Y. 672, 120 N.E.2d 847; Bleecker Luncheonette v. Wagner, 286 App. Div. 828, 143 N.Y.S.2d 628, motion for leave to appeal denied 309 N.Y. 1029, 128 N.E.2d 760.

Plaintiffs say the New York cases are not controlling because of the requirement in the New York law for a public auction, saying of the Fordham University case, "such prior contacts and negotiations as may have existed between the redevelopment authorities and the University were rendered largely insignificant by the auction requirement." However, the bidding at such auctions is on a very restricted basis. In that case Fordham was the only bidder and by pre-auction contract it was required to agree to bid a stated minimum price, redevelop as required by the plan, clearing the site and relocating prior occupants. Our law (Sec. 99.450) authorizes sale by negotiation at fair value for uses in accordance with the redevelopment plan giving consideration to the uses and purposes required, the restrictions upon and the covenants, conditions and obligations assumed by the redeveloper, after inviting proposals by newspaper notices. The Authority is also given discretion to dispose of property "under such reasonable competitive bidding procedures as it may prescribe." It was shown that Authority tried competitive

bidding in the Plaza project but received only one bid which it rejected and thereafter made a sale by negotiation for almost double the amount of that bid. In view of the findings of the trial court on the fact issues, which we accept as correct from our review of the record, plaintiffs' contention of illegal designation and subsidy from public funds cannot be sustained.

■ Likewise, since we cannot accept as the true facts the factual basis on which plaintiffs' claim of abuse of eminent domain, by taking private property for private use, is founded, we cannot sustain that contention. Plaintiffs rely on Sec. 28, Art. I, Const. of Mo., which of course prevents private property from being taken under the guise of a pretended public use when in fact it is only for the convenience of private persons as held in State ex rel. United Railways Co. v. Wiethaupt, 231 Mo. 449, 133 S.W. 329, and Kansas City v. Hyde, 196 Mo. 498, 96 S.W. 201, 7 L.R.A.,N.S., 639, 113 Am.St.Rep. 766, cited by plaintiffs. These cases involve condemnation of a single tract; and plaintiffs' contentions fail to consider that the situation presented herein is the redevelopment of an area, which is a public purpose, and not the condemnation and sale of a single tract to University. In fact it appears that the land sold to the University would be acquired by purchase and not by condemnation, except some reversionary interests in the public plaza included, which is hereinafter discussed. Other authorities cited by plaintiffs (29 C. J.S. Eminent Domain § 29, p. 818; Lewis, Eminent Domain, 2d Ed., Secs. 631, 632; Hogue v. Port of Seattle, 54 Wash.2d 799, 341 P.2d 171) are consistent with the principle of the above-cited Missouri cases but none of them involve Redevelopment Laws. In this connection, Sec. 21, Art. VI, of our 1945 Constitution must be considered with Sec. 28, Art. I, and the two construed together. Since the acquisition of the whole area (the boundaries of which plaintiffs have not questioned) was for a public purpose, plaintiffs' contention as to abuse of eminent domain must necessarily rest on their claim of illegal designation.

■ Plaintiffs cite the following statement from our Kansas City Redevelopment case (270 S.W.2d loc. cit. 51): "Under the Redevelopment Law, private owners come into the picture only after the land has been acquired and cleared." However, that does not mean, as plaintiffs seem to contend, that prior to acquisition and clearing there can be no planning for use, search for redevelopers, efforts to interest them in the project or tentative negotiations to find out what commitments they would be willing to make. It is clear from the evidence in this case that this must be done before there can be sufficient information for approval by the federal agency which provides two-thirds of the project costs. In fact Sec. 99.430(7) requires statements by the Authority to the governing body of the city, before it approves the plan, both of estimated cost of acquisition and preparation for redevelopment and of estimated proceeds or revenues from its disposal to redevelopers. Certainly there could be no substantial basis for the latter estimate without some preliminary tentative negotiations to find that there were interested redevelopers and what they were willing to do.

In the Kansas City case, we said: "We hold that Article I, § 28, and Article VI, § 21, considered together and in the light of the above cited cases, mean that final determination of the question whether the contemplated use of any property sought to be taken under the Law here in question is public rests upon the courts, but that a legislative finding under said law that a blighted or insanitary area exists and that the legislative agency proposes to take the property therein under the processes of eminent domain for the purpose of clearance and improvement and subsequent sale upon such terms and restrictions as it may deem in the public interest will be accepted by the

courts as conclusive evidence that the contemplated use thereof is public, unless it further appears upon allegation and clear proof that the legislative finding was arbitrary or was induced by fraud, collusion or bad faith." As noted, the trial court has found against plaintiffs' claim of fraud, collusion or bad faith and we have accepted such findings as correct. Authority's policy was that it would not seek to acquire property of religious or educational institutions already in the area and that it would accept them as redevelopers if they desired to expand. In the Mill Creek project this was done with churches, Y.M.C.A., and the Christian Board of Publication, which made a considerable expansion of its properties. The United States Supreme Court recognized this policy as proper in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 103, 99 L.Ed. 27, a District of Columbia redevelopment case, saying: "It was important to redesign the whole area so as to eliminate the conditions that cause slums— the overcrowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational areas, the lack of light and air, the presence of outmoded street patterns. It was believed that the piecemeal approach, the removal of individual structures that were offensive, would be only a palliative. The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes but also *schools, churches,* parks, streets, and shopping centers. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevented. * * * Such diversification in future use is plainly relevant to the maintenance of the desired housing standards and therefore within congressional power." (Emphasis ours.)

In Bleecker Luncheonette v. Wagner, Sup., 141 N.Y.S.2d 293, 296, involving a slum clearance project, plaintiff claimed "that the plan and project involved was purposely maneuvered so as to obtain for New York University the portion thereof which is intended to be devoted to educational purposes and that by virtue of such allocation to New York University, the proposed sale by the City of New York, at public auction of this portion of the property involved, was merely a sham and that real competitive bidding at the sale was to be stifled." In that case New York University had advanced $25,000.00 to help defray the cost of studying the area for redevelopment. The court said: "The proof submitted by defendants amply supports the fact that this sum was accepted conditionally by the city without any commitment on its part, or in any way giving the university any preference or assurance that it would be the successful party in obtaining the property. It represented nothing more than a business risk assumed by the university in order to help the city accelerate preliminary studies which otherwise would have been delayed due to lack of funds therefor." The court also said: "Cited by plaintiff, among the causes for its complaint, are several instances affecting an earlier project (since abandoned) where reports of the City Planning Commission and the Committee on Slum Clearance indicated that New York University was to ultimately become the owner of the educational portion of the project area. The careless language, in these isolated instances, indicated no more than that it was recognized that, in view of the proximity of this university to the project area, such university was *likely* (emphasis mine) to be the successful bidder at the public sale. It was apparent, and we cannot shut our eyes to so patent a factual situation, that New York University, by reason of its proximity (together with its present buildings) to the area in question, would logically and in reasonable likelihood be a bidder at the proposed sale of the relevant area." Likewise in this case, because of its location, and

also because it already owned and used land in the redevelopment area, University was likely to be interested as a redeveloper to expand its ownership in the area.

■ Plaintiffs' contention as to failure to legally advertise is based on its interpretation of our statement in the Kansas City case (270 S.W.2d loc. cit. 51) that the private redeveloper comes into the picture only after the land has been acquired and cleared; and also on their claim that University was designated to get the tract involved before Authority advertised for redevelopers and before City adopted its ordinance approving the Redevelopment Plan. As to this we adopt the view of the trial court, stated as follows: "In their briefs plaintiffs lay great stress on the provision of the statute that no redevelopment proposal may be considered before publication of the advertisement required by the statute; and they insist that any tentative reference to University expansion on various plats and charts was a violation of the statute. [Sec. 99.450(2) requires publication of notice "prior to the consideration of any redevelopment contract proposal."] We think that the vice in this argument is that it gives an improper and inaccurate meaning to the word 'consider'. As used in the statute, the word must connote a formal consideration of a formal proposal (which would come after the advertising). It would be an extreme interpretation of the statutory language to hold that the Legislature meant that interested people and the Authority through its commissioners and officers could do no *thinking* previous to the advertising. There was some thinking, some recognition of possibilities and probabilities, but there was no agreement or contract in advance of proper time." Since there were published notices, both in 1957 and 1958, before any contract was made with University, our view is that the trial court's finding should be accepted and plaintiffs' contentions decided against them.

We also find plaintiffs' other claims (sale not made at fair value and donation of a public plaza) to be without merit. As to fair value, plaintiffs say, "Authority's power, however, can only come from Chapter 99 which requires sale at 'fair value' and does not contain any such classification or procedure as was used by Authority." (Plaintiffs cite Sec. 99.450(1) as controlling but it does not specify classification of uses to be made. It states: "In determining the fair value of real property for uses in accordance with the redevelopment plan, an authority shall take into account and give consideration to the uses and purposes required by such plan; the restrictions upon, and the covenants, conditions and obligations assumed by the redeveloper of such property; the objectives of the redevelopment plans for the prevention of the recurrence of blighted, or unsanitary area; and such other matters as the authority shall specify as being appropriate." The appraisals of the tract involved were shown to have been made on the most likely alternative private use without regard for social or community goals and without any purpose of aiding education or welfare. University paid as high a price per square foot as other redevelopers of adjoining land and higher than the appraisals. In addition to the price fixed, University was required to clear the land it owned in the area of the building known as Champlin Hall. (It was shown that this saved $100,000.00 for Authority over purchase, clearing and resale at appraised re-use value.) Like all buyers, University was required to continue its designated use for 25 years and during that period was not permitted to sell land purchased without permission of Authority. There is no evidence that anyone else ever made an offer for the tract involved; and it is significant that other redevelopers (including the two largest who are developing adjoining tracts) have intervened asking that the sale to University be approved for the benefit of the whole project and the success of their own redevelopments, which

**704**

are both residential and commercial. We find the evidence fully supports the finding of the trial court as to fair value.

The public plaza involved was a small area near Grand known as Camp Jackson Plaza. Plaintiffs' contention about this also depends on their claim of a prior agreement for the eventual use of the land by University. The Plaza had been established and named prior to 1926 and a private society given permission to erect there a statue of General Nathaniel Lyon. After the Redevelopment Plan and cooperation agreement was approved by ordinance, City by ordinances vacated the Plaza and streets composing it, repealed the ordinance authorizing the erection of the statue and granted permission to place the statue in another place designated as Lyon Park. Several miles of other streets and alleys in the Mill Creek area also were vacated in accordance with the Plan. These streets went to the Authority which sold them with the other land going to redevelopers. City, which was obligated by the cooperation agreement to pay one-third of the project's cost, benefited to the extent of one-third of the difference between the Authority's cost and its selling price of these street areas. In this case, Authority's total acquisition cost of the Camp Jackson area (by purchase and condemnation) was shown as $17.00; while the sales price received for it from University was $29,801.75.

Our conclusion on the whole case is that since the trial court found the essential fact issues against plaintiffs and we conclude that we should accept these findings as proper and correct, plaintiffs' contentions on this appeal cannot be sustained. Because of the view we take it is not necessary to consider defendants' affirmative defenses of laches and estoppel.

The judgment is affirmed.

All concur.