# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1382

_____

Trinity Lutheran Church of Columbia, Inc.

*Plaintiff - Appellant*

v.

Sara Parker Pauley, in her official capacity

*Defendant - Appellee*

------------------------------

The Becket Fund for Religious Liberty

*Amicus on Behalf of Appellant(s)*

American Civil Liberties Union Foundation, et al.

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: January 15, 2015
Filed: May 29, 2015

_____

Before LOKEN, MELLOY, and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

Trinity Lutheran Church of Columbia, Inc. ("Trinity Church"), filed this action alleging that Sara Pauley, acting in her official capacity as Director of the Missouri Department of Natural Resources ("DNR"), violated Trinity Church's rights under the United States and Missouri Constitutions by denying its application for a grant of solid waste management funds to resurface a playground on church property. The district court[1] dismissed the Complaint for failure to state a claim and denied Trinity Church's post-dismissal motion for leave to file an amended complaint. Trinity Church appeals both rulings. We affirm.

## I. Background

Trinity Church operates on its church premises a licensed preschool and daycare called the Learning Center. Initially established as a non-profit corporation, the Learning Center merged into Trinity Church in 1985. The Learning Center has an open admissions policy. It is a ministry of Trinity Church that teaches a Christian world view and incorporates daily religious instruction in its programs.

DNR offers Playground Scrap Tire Surface Material Grants, a solid waste management program. The grants provide DNR funds to qualifying organizations for the purchase of recycled tires to resurface playgrounds, a beneficial reuse of this solid waste. See Mo. Rev. Stat. §§ 260.335.1, 260.273.6(2). In 2012, Trinity Church applied for a grant to replace the Learning Center's playground surface, disclosing that the Learning Center was part of Trinity Church. On May 21, 2012, the Solid Waste Management Program Director wrote the Learning Center's Director, advising:

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

> [A]fter further review of applicable constitutional limitations, the department is unable to provide this financial assistance directly to the church as contemplated by the grant application. Please note that Article I, Section 7 of the Missouri Constitution specifically provides that "no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, section or denomination of religion."

A Solid Waste Management Program planner subsequently advised the Solid Waste Management District Director that Trinity Church's application ranked fifth out of forty four applications in 2012, and that fourteen projects were funded.

Trinity Church commenced this action, asserting federal question jurisdiction over claims that the denial of its Scrap Tire application violated (i) the Equal Protection Clause of the Fourteenth Amendment, (ii) its First Amendment right to free exercise of religion, (iii) the First Amendment's Establishment Clause, and (iv) its First Amendment right of free speech. The Complaint invoked the district court's supplemental jurisdiction over a fifth cause of action, alleging that DNR's denial violated Article I, Section 7, of the Missouri Constitution. Trinity Church sought injunctive and declaratory relief against DNR "policies and actions in denying grants to applicants who are churches or connected to churches."

The district court granted Director Pauley's motion to dismiss the complaint for failure to state a claim. Trinity timely moved for reconsideration and for leave to amend its complaint to add a factual allegation that the DNR had previously given grants under the Scrap Tire Program to at least fifteen other religious organizations, including churches. The district court denied the motion to reconsider. It also denied leave to amend because Trinity Church "fail[ed] to provide any explanation for not amending its Complaint prior to the dismissal of this action." The court further noted that the amendment was "futile" because, while Trinity Church argued the newly alleged fact "undermines Missouri's purported interest" in denying the application,

-3-

Trinity Church "failed to identify any valid legal theory under which Missouri would need to show the existence of a compelling interest."

Trinity Church appeals every aspect of the district court's rulings, except the dismissal of its First Amendment free speech claim. We review the dismissal of a complaint for failure to state a claim *de novo*. Dunbar v. Wells Fargo Bank, N.A., 709 F.3d 1254, 1256 (8th Cir. 2013). We review the denial of leave to amend for abuse of discretion, but we review *de novo* legal conclusions underlying a determination of futility. In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig., 623 F.3d 1200, 1208 (8th Cir. 2010).

## II. The Federal Constitutional Claims

"Missouri has a long history of maintaining a very high wall between church and state." Luetkemeyer v. Kaufmann, 364 F. Supp. 376, 383-84 (W.D. Mo. 1973), aff'd, 419 U.S. 888 (1974). Two provisions in the Missouri Constitution "declaring that there shall be a separation of church and state are not only more explicit but more restrictive than the Establishment Clause of the United States Constitution." Paster v. Tussey, 512 S.W.2d 97, 101-02 (Mo. banc 1974), cert. denied, 419 U.S. 1111 (1975). Those provisions, one of which is at the core of this dispute, were initially adopted in 1870 and 1875. As re-adopted in the Missouri Constitution of 1945, they now provide:

> **Art. I, § 7.** That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect, or creed of religion, or any form of religious faith or worship.

-4-

**Art. IX, § 8.** Neither the general assembly, nor any county, city, town [etc.] shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school . . . or other institution of learning controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation . . . ever be made by the state . . . for any religious creed, church, or sectarian purpose whatever.[2]

Trinity Church's Complaint alleged that, by denying its grant application solely because it is a church, DNR (i) violated the Free Exercise clause because it "target[ed] religion for disparate treatment" without a compelling government interest; (ii) violated the Establishment Clause because the denial "was hostile to religion" and required DNR "to determine what is religious enough" to justify denial; and (iii) violated the Equal Protection Clause by discriminating against religious learning centers and day care organizations without a compelling government interest. Although Trinity Church couched these claims as an attack on DNR's "customs, policies and practices," all its claims are plainly facial attacks on Article I, § 7, of the Missouri Constitution, which provides that "no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church," and which was cited by DNR as the sole basis for its denial.

Viewed in this light, it is apparent that Trinity Church seeks an unprecedented ruling -- that a state constitution violates the First Amendment and the Equal Protection Clause if it bars the grant of public funds to a church. To prevail, Trinity Church must clear a formidable if not insurmountable hurdle, what appears to be controlling adverse precedent. In Luetkemeyer, a three-judge district court was convened in the Western District of Missouri to consider a claim that the First

---

[2]These two Sections are construed together to make up Missouri's Establishment Clause. See St. Louis Univ. v. Masonic Temple Ass'n of St. Louis, 220 S.W.3d 721, 725 (Mo. banc 2007).

-5-

Amendment and the Equal Protection clause required Missouri to provide the same public transportation benefits for the pupils of church-related schools as were being provided to transport children to public schools. 364 F. Supp. at 377. In denying plaintiffs injunctive and damage relief, the majority explained:

> We conclude without hesitation that the long established constitutional policy of the State of Missouri, which insists upon a degree of separation of church and state to probably a higher degree than that required by the First Amendment, is indeed a 'compelling state interest in the regulation of a subject within the State's constitutional power' . . . That interest, in our judgment, satisfies any possible infringement of the Free Exercise clause of the First Amendment or of any other prohibition in the Constitution of the United States.
>
> *   *   *   *   *
>
> The fact that Missouri has determined to enforce a more strict policy of church and state separation than that required by the First Amendment does not present any substantial federal constitutional question.

Id. at 386 (quotation and citations omitted). Plaintiffs appealed to the Supreme Court of the United States. The Court summarily affirmed. Two Justices dissented, arguing the Court should have noted probable jurisdiction and set the case for argument on two questions, whether the different treatment of public-school and parochial-school children violated equal protection principles, and whether the arbitrary denial of a general public service made the State an "adversary" of religion. 419 U.S. at 890 (White, J., dissenting).

When the Supreme Court summarily affirms a lower federal court, its decision "prevent[s] lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided," but the Court has affirmed only the judgment, not necessarily the rationale of the lower court. Mandel v. Bradley, 432 U.S. 173, 176

(1977).  Here, while the parameters of the Supreme Court's summary affirmance in Luetkemeyer may not be free from doubt, given the issues addressed in the dissent from summary affirmance, we conclude that the Court necessarily decided that Article I, § 7, of the Missouri Constitution is *not* facially invalid.  That conclusion is supported by the Court's prior summary affirmance in Brusca v. State of Mo. ex rel. State Bd. of Educ., 332 F. Supp. 275, 279-80 (E.D. Mo. 1971) (concluding that Article IX, § 8, and Missouri statutes denying public funds to sectarian schools for religious instruction do not violate the Free Exercise or the Equal Protection clauses), aff'd, 405 U.S. 1050 (1972); see also Wheeler v. Barrera, 417 U.S. 402, 412 n.9, 421-22, 426 (1974).

Trinity Church requests injunctive relief compelling Missouri to provide grants directly to churches, funding that is prohibited by a provision of the Missouri Constitution that has been a bedrock principle of state law for nearly 150 years. Without question, a state constitutional provision is invalid if it conflicts with either religion clause of the First Amendment, or with the Fourteenth Amendment's Equal Protection Clause.  We also recognize that the Supreme Court's Establishment Clause jurisprudence has evolved rather dramatically in the forty years since Luetkemeyer was decided.  For example, it now seems rather clear that Missouri could include the Learning Center's playground in a non-discriminatory Scrap Tire grant program without violating the Establishment Clause.  But the issue here is not what the State is constitutionally permitted to do, but whether the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause *compel* Missouri to provide public grant money directly to a church, contravening a long-standing state constitutional provision that is not unique to Missouri.

No Supreme Court case, before or after Luetkemeyer, has granted such relief. Indeed, in Locke v. Davey, 540 U.S. 712 (2004), the Court upheld State of Washington statutes and constitutional provisions that barred public scholarship aid to post-secondary students pursuing a degree in theology.  The Court noted the

"popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an 'established' religion." Id. at 722. In Locke, "the link between government funds and religious training [was] broken by the independent and private choice of [scholarship] recipients," id. at 719, prompting the Court to examine carefully the "relatively minor burden" the scholarship exclusion placed on students taking devotional theology courses, id. at 725. By contrast, in this case there is no break in the link. Trinity Church seeks to compel the direct grant of public funds to churches, another of the "hallmarks of an 'established' religion." Therefore, while there is active academic and judicial debate about the breadth of the decision, we conclude that Locke reinforces our decision that Luetkemeyer is controlling precedent foreclosing Trinity Church's facial attack on Article I, § 7, of the Missouri Constitution.

Justice Scalia, dissenting for himself and Justice Thomas in Locke, articulated a contrary view of the First Amendment's religion clauses:

> When the State makes a public benefit generally available, that benefit becomes part of the baseline against which burdens on religion are measured; and when the State withholds that benefit from some individuals solely on the basis of religion, it violates the Free Exercise Clause no less than if it had imposed a special tax.

Id. at 726-27. If the Court were to adopt this view, and if Justice Scalia's reference to withholding benefits to "individuals" were held to include direct public benefits to churches, then Article I, § 7, of the Missouri Constitution could not be validly applied to deny church participation in a host of publicly-funded programs. That may be a logical constitutional leap in the direction the Court recently seems to be going, but it is a leap of great magnitude from the Court's decisions in Luetkemeyer and in Locke. In our view, only the Supreme Court can make that leap. As the Court has often reminded us, a court of appeals "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Agostini v.

Felton, 521 U.S. 203, 237 (1997) (an Establishment Clause decision). We therefore follow Luetkemeyer and the many Supreme Court of Missouri decisions concluding that Article I, § 7, of the Missouri Constitution does not conflict with the First Amendment or the Equal Protection Clause of the United States Constitution.

For these reasons, we conclude that the district court correctly dismissed Trinity Church's federal constitutional claims for failure to state a claim upon which relief could be granted.[3]

---

[3]Even if Luetkemeyer were not controlling, we see little merit to Trinity Church's constitutional arguments, based on existing precedent. The Supreme Court in Locke expressly recognized that "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." 540 U.S. at 719. Until the Court rules otherwise, the direct expenditure of public funds to aid a church is a paradigm example of that type of state action. "There is *no* relevant precedent for using [the Establishment Clause's] negative prohibition as a basis for extending the right of a religiously affiliated group to secure state subsidies." Strout v. Albanese, 178 F.3d 57, 64 (1st Cir.), cert. denied, 528 U.S. 931 (1999); see Bronx Household of Faith v. Bd. of Educ. of City of N.Y., 750 F.3d 184, 198 (2d Cir. 2014), cert. denied, --- S. Ct. ---, 2015 WL 1400936 (2015); Eulitt ex rel. Eulitt v. Maine, Dept. of Educ., 386 F.3d 344, 355 (1st Cir. 2004). DNR's decision to deny the grant application because Trinity Church is a "church" within the meaning of Article I, § 7, of the Missouri Constitution hardly required an excessive entanglement with religion, unlike the state statute at issue in Colorado Christian Univ. v. Weaver, 534 F.3d 1245, 1250-51 (10th Cir. 2008) (requiring consideration of factors to determine whether a scholarship applicant was ineligible because the institution of higher education was "pervasively sectarian").

As the district court recognized, in the absence of a valid Free Exercise claim, Trinity Church's Equal Protection Claim is governed by rational basis review. Locke, 540 U.S. at 720 n.3. The high wall of separation between church and state created by Article I, § 7, is a historic and substantial State interest that DNR was obligated to obey in administering the Spare Tire grant program. This interest clearly satisfies rational basis review. See Luetkemeyer, 364 F. Supp. at 383-84 and cases cited.

### III. The Missouri Constitutional Claim

Trinity Church's fifth cause of action alleged that the DNR's grant denial violated the second clause of Article I, § 7, which forbids "any discrimination made against any church," and that granting the application would not have violated the first clause because it would not have been "in aid of any church." Though pleaded last, this was the only claim argued at length by Trinity Church at the hearing on defendant's motion to dismiss, and it was the lead argument in its brief on appeal (seemingly an implicit acknowledgment the federal constitutional claims are weak). This inversion of the theories pleaded distracted the district court from a very serious issue -- after dismissing the federal claims, should the court have declined to exercise its supplemental jurisdiction over a state law claim that is based on an important provision of the Missouri Constitution and turns on the proper interpretation of rather ambiguous Supreme Court of Missouri precedents? We think that question should have been answered affirmatively, but we will nonetheless review the district court's dismissal of this claim on the merits.

Under Missouri law, the district court had jurisdiction to decide the state law claim pleaded in the initial Complaint because whether Article I, § 7, permits DNR to deny Scrap Tire Program grants to all church applicants is an issue of law. See Premium Std. Farm, Inc. v. Lincoln Twp., 946 S.W.2d 234, 237-38 (Mo. banc 1997) (exhaustion of administrative remedies is a jurisdictional issue); Motor Control Specialties, Inc. v. Petelik, 258 S.W.3d 482, 485-86 (Mo. App. 2008). Turning to the merits, we agree with the district court that the two clauses of Article I, § 7, must be interpreted in harmony. See Union Elec. Co. v. Dir. of Revenue, 425 S.W.3d 118, 122 (Mo. banc 2014); Wring v. City of Jefferson, 413 S.W.2d 292, 300 (Mo. banc 1967). Therefore, if granting Trinity Church's application would have constituted "aid" to a church prohibited by the first clause of Article I, § 7, then denying the grant was not a discriminatory action prohibited by the second clause. So the district court properly focused on Trinity Church's contention that a Scrap Tire Program grant is

not "aid" within the meaning of the first clause of Article I, § 7, because it involves a quid pro quo, with the applicant undertaking obligations under the Scrap Tire Program in exchange for the granted funds. On appeal, Trinity Church argues the court erred in rejecting this interpretation of state law.

Trinity Church bases its contention on the reasoning in two Supreme Court of Missouri decisions, Kintzele v. City of St. Louis, 347 S.W.2d 695 (Mo. banc 1961), which Trinity Church did not cite to the district court, and Americans United v. Rogers, 538 S.W.2d 711 (Mo. banc), cert. denied, 429 U.S. 1029 (1976), which the district court described as "grossly misrepresented" by Trinity Church. Concluding that the quid pro quo exception to Article I, § 7's, prohibition was not supported by any Missouri case, the court instead relied on the many Supreme Court of Missouri decisions that "strictly interpreted [Article I] Section 7 to prohibit public funding of religious institutions" in order to maintain "the higher wall of separation between church and state present in the Missouri Constitution." See Paster, 512 S.W.2d at 104-105 (invalidating statute requiring public school boards to provide textbooks to private school students); Bereghorn v. Reorg. Sch. Dist. No. 8, 260 S.W.2d 573, 582-83 (Mo. 1953); McVey v. Hawkins, 258 S.W.2d 927, 933-34 (Mo. 1953) (enjoining use of public school buses to transport students to religious schools); Harfst v. Hoegen, 163 S.W.2d 609, 613-14 (Mo. 1941) (enjoining use of public school funds for the teaching of religion and faith at a parochial school that was taken into the public school system); accord Luetkemeyer, 364 F. Supp. at 383-84 (upholding the State's refusal to provide transportation to church-sponsored schools); Brusca, 332 F. Supp. at 279-80 (the State may deny funds to sectarian schools for religious instruction).

Based on these decisions, the district court concluded that Trinity Church's state law claim under the Missouri Constitution must be dismissed because its "own pleadings demonstrate that funds from [DNR] in the form of the Scrap Tire Program would aid the Church and its Ministry Learning Center within the meaning of

-11-

Missouri law." We agree with this assessment of how the Supreme Court of Missouri would decide this claim. In Kintzele, plaintiffs alleged that a subsidized sale of land by the State to St. Louis University constituted an unconstitutional use of public funds in aid of a private sectarian school. The Court declined to invalidate the sale, concluding that, because Missouri law authorized "sale by negotiation at fair value," and the State tried competitive bidding and thereafter sold the land to SLU at nearly twice the highest bid, "plaintiffs' contention of illegal . . . subsidy from public funds cannot be sustained." 347 S.W.2d at 700-701. This decision in no way supports Trinity Church's claim that a Scrap Tire Program grant is not "aid."

In Americans United, the Supreme Court of Missouri upheld a statute providing tuition grants to students at approved public and private colleges. The statute was invalidated by the trial court, applying Article I, § 7, and Article IX, § 8. The State appealed. Noting that "[a]n act of the legislature is presumed to be valid and will not be declared unconstitutional unless it clearly and undoubtedly contravenes some constitutional provision," 538 S.W.2d at 716, the Court concluded it could not "with confidence declare that the statutory program" clearly contravened these constitutional provisions because "the parochial school cases with which the court has dealt in the past involved completely different types of educational entities than the colleges and universities herein involved." Id at 721-22. The defendants' quid pro quo argument was noted but not adopted. Id. at 721.

Americans United demonstrates that Article I, § 7, will be difficult to apply in some cases, particularly when an expenditure authorized by state statute is challenged as beyond the State's constitutional authority. But that decision does not support Trinity Church's claim to affirmative relief in this case. In upholding the challenged program, the Court reaffirmed that the Missouri Constitution is "more restrictive than the First Amendment to the United States Constitution in prohibiting the expenditures of public funds in a manner tending to erode the absolute separation of church and state," and it noted that the program was "designed and implemented for the benefits

of the students, not of the institutions, and that the awards are made to the students, not to the institutions. The legislative purpose in no wise includes supporting aiding or sustaining either public or private educational institutions." Id. at 720.

We affirm the district court's dismissal of the state law claim under the Missouri Constitution in Trinity Church's original Complaint.

## IV. The Motion to Amend

Following the district court's dismissal order, Trinity Church filed a motion to reconsider that included a motion for leave to amend its Complaint. The proposed Amended Complaint added a fact paragraph alleging that the DNR had previously awarded Scrap Tire Program grants to at least fifteen other religious organizations. It also added a paragraph to the Equal Protection Clause cause of action alleging that DNR "has allowed other similarly-situated religious organizations to participate in the Scrap Tire Program." All other allegations in the ninety-seven-paragraph Complaint were unchanged. Trinity Church attached as an exhibit a document dated October 19, 2010, that listed "Prior Recipients of Scrap Tire Surface Material Grants." The district court denied the motion because Trinity Church failed to provide any explanation for failing to amend prior to dismissal of its action.

"Post-dismissal motions to amend are disfavored." Medtronic, 623 F.3d at 1208. While a post-dismissal motion may be granted if timely requested, "interests of finality dictate that leave to amend should be less freely available after a final order has been entered." U.S. ex rel. Roop v. Hypoguard USA, Inc., 559 F.3d 818, 823 (8th Cir. 2009). Numerous cases have ruled that unexcused delay is sufficient to justify denial of post-dismissal leave to amend. United States v. Mask of Ka-Nefer-Nefer, 752 F.3d 737, 743-44 (8th Cir. 2014), and cases cited.

-13-

On appeal, Trinity Church for the most part ignores this well-established law, simply distinguishing the cases cited by the district court because Trinity Church was not "given any warning that it needed to amend its pleadings." The briefs on appeal assert that Trinity Church learned in discovery that other religious entities had received grants, but counsel admitted at oral argument that Trinity Church obtained the October 2010 listing attached to the proposed Amended Complaint from the DNR website, where it was doubtless available when Trinity Church filed its Complaint in January 2013. Thus, the district court did not abuse its discretion in concluding that Trinity Church failed to provide a valid reason for its failure to amend prior to dismissal.

The district court's alternative futility ruling is more problematic and warrants *de novo* consideration. The proposed amended pleading did not alter the allegations in the First Amendment causes of action based on the Free Exercise Clause and the Establishment Clause; it only alleged a different type of discrimination violating the Equal Protection Clause, discrimination between "similarly situated religious organizations." Thus, when Trinity Church argued to the district court that its newly discovered evidence supported the claim that DNR's grant application denial "lacks a compelling interest," the district court was right to observe that this added nothing to the original claims because, in the absence of a valid Free Exercise or Establishment Clause claim, the Equal Protection Clause claim was subject to rational basis review and no compelling interest need be shown.

There is a problem lurking here, one that was camouflaged by Trinity Church's primary contention that Article I, § 7, violates the federal and state constitutions by mandating that churches be excluded from the Scrap Tire Program. The problem is that these constitutional claims take on an entirely new complexion if DNR is awarding Scrap Tire grants to some churches, but not to others. If intentional, that would be a clear violation of the First Amendment, and no doubt of the Missouri Constitution as well. See, e.g., Larson v. Valente, 456 U.S. 228, 246 (1982) ("No

-14-

State can pass laws which aid one religion or that prefer one religion over another"); Waites v. Waites, 567 S.W.2d 326, 333 (Mo. banc 1978) ("Any suggestion that a state judicial officer [was] favoring or tending to favor one religious persuasion over another . . . would be intolerable to our organic law"). If the proposed Amended Complaint plausibly pleaded this dramatically new theory, did the district court abuse its discretion in failing to grant leave to amend, even if Trinity Church failed to clearly articulate the theory? We conclude not, for two distinct but related reasons.

First, "a district court does not abuse its discretion in refusing to allow amendment of pleadings to change the theory of a case if the amendment is offered after summary judgment has been granted against the party, and no valid reason is shown for the failure to present the new theory at an earlier time." Littlefield v. City of Afton, 785 F.2d 596, 610 (8th Cir. 1986) (quotation omitted). In Littlefield, we affirmed the denial of leave to amend a dismissed § 1983 due process action to assert a new equal protection claim. Id. at 609. That is directly analogous to the situation here. The facts were at hand to assert this narrower theory in the initial Complaint, but Trinity Church chose not to do so. "The district court did not abuse its discretion in concluding [this] tactical choice did not demonstrate diligence or good cause." Morrison Ents., L.L.C. v. Dravo Corp., 638 F.3d 594, 611 (8th Cir.), cert. denied, 132 S. Ct. 244 (2011).

Second, the new theory we have identified would significantly alter the lawsuit's procedural landscape. Under the new theory, both the federal and state constitutional claims would turn on the fact bases for DNR's allegedly discriminatory treatment of similarly situated religious organizations, not on a Constitution-driven "policy" of not making any grants to churches. For the federal claims, this raises a serious question of what is called Pullman abstension[4] -- "federal courts should abstain from decision when difficult and unsettled questions of state law must be

---

[4]Derived from Railroad Comm'n v. Pullman Co., 312 U.S. 496 (1941).

resolved before a substantial federal constitutional question can be decided." Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 236 (1984); see Beavers v. Ark. State Bd. of Dental Exam'rs, 151 F.3d 838, 840-41 (8th Cir. 1998). Here, a state court would be in the best position to decide the "difficult and unsettled" question of how Article I, § 7, and other provisions of the Missouri Constitution and statutes apply to DNR's fact-based decisions whether to award Scrap Tire Program grants to particular church-related applicants. And state court resolution of that question would likely moot or resolve, and most certainly would affect, a federal court's resolution of the substantial, largely overlapping First Amendment and Equal Protection Clause issues.

For the state law claim, the new theory appears to raise serious jurisdiction and venue issues under the Missouri Administrative Procedure Act, Mo. Rev. Stat. §§ 536.010 et seq. See Motor Control Specialties, 258 S.W.3d at 485-87. These issues would best be resolved by a state court, further supporting Pullman abstention. In these circumstances, even if the proposed Amended Complaint pleaded a new theory of relief that was not entirely futile, the district court did not abuse its discretion in denying an untimely request to fundamentally alter the litigation.

The judgment of the district court is affirmed.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

Trinity Lutheran Church ("Trinity Lutheran") applied for a grant through the Learning Center, a daycare and preschool that Trinity Lutheran runs. This grant would allow the Learning Center to make its playground safer by swapping the gravel that covers it for a rubber surface made from recycled tires. The Missouri Department of Natural Resources ("the Department"), which administers this grant program, accepted Trinity Lutheran's application and ranked it fifth out of the forty-four applications from that year. The Department approved fourteen grant applications, but Trinity Lutheran's was not among them. Relying solely on the Missouri

-16-

Constitution's prohibition on using public funds to aid a church, Mo. Const. art. I, § 7, the Department denied Trinity Lutheran's grant application. Thus, but for the fact that the Learning Center was run by a church, it would have received a playground-surfacing grant. Where, as here, generally available funds are withheld solely on the basis of religion, the Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712 (2004), governs claims brought under the Free Exercise Clause of the First Amendment. Applying the careful balance struck by *Locke*, I would conclude that Trinity Lutheran has sufficiently pled a violation of the Free Exercise Clause as well as a derivative claim under the Equal Protection Clause.

The court attempts to impose a barrier to full consideration of *Locke*. Trinity Lutheran, the court concludes, challenges the facial validity of Article I, § 7 of the Missouri Constitution by requesting a ruling that "a state constitution violates the First Amendment and the Equal Protection Clause if it bars the grant of public funds to a church." *Ante* at 5. By framing Trinity Lutheran's claim this broadly, the court avoids fully grappling with *Locke* by merely pointing to an instance in which this state constitutional provision has been upheld. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (requiring a plaintiff raising a facial attack to show "no set of circumstances" under which a provision would be valid). The court concludes that the Supreme Court's summary affirmance in *Luetkemeyer v. Kaufmann*, 364 F. Supp. 376 (W.D. Mo. 1973), *aff'd*, 419 U.S. 888 (1974), a case that concerned the separate issue of busing, *id.* at 377, is one such application.[5]

But Trinity Lutheran does not mount the expansive facial challenge that the court attributes to it. Trinity Lutheran tries to bring an as-applied challenge; the complaint says so numerous times. However, determining whether a constitutional

---

[5]The Department did not cite *Luetkemeyer* in its appeal brief. By the court's reasoning, the Department's failure to raise this argument (much less order it first in its brief) serves as "seemingly an implicit acknowledgement" that this argument is "weak." *Ante* at 10.

challenge is purely as-applied, purely facial, or somewhere in between turns on whether the plaintiff's "claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiff[]." *Doe v. Reed*, 561 U.S. 186, 194 (2010). If they do, the claim is facial but only "to the extent of that reach." *Id.* When analyzing a claim and the relief that would follow, a court should "construe a plaintiff's challenge, if possible, to be as-applied." *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 864 (11th Cir. 2013), *cert. denied*, 572 U.S. ---, 134 S. Ct. 1877 (2014). Trinity Lutheran, as the court acknowledges, frames its challenge as an attack on the Department's "customs, policies, and practices." And Trinity Lutheran specifically requests a declaration that the Department's denial of its grant application was unconstitutional. Trinity Lutheran also specifically requests injunctive relief prohibiting the Department from discriminating against it in future grant applications. *Id.* at 862 ("We look to the scope of the relief requested to determine whether a challenge is facial or as-applied in nature."). This claim and relief only implicate Trinity Lutheran. *See Doe*, 561 U.S. at 194. Consequently, Trinity Lutheran does not contend that Article I, § 7 of the Missouri Constitution is unconstitutional in all of its applications.

This brings me to *Locke*. In the face of a Free Exercise challenge, the Court upheld a college scholarship program that prevented students from using the scholarship to pursue a degree in devotional theology, a course of study that the court characterized as "akin to a religious calling as well as an academic pursuit." 540 U.S. at 715, 721, 725. The Court began with the proposition that "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.* at 719. Because the "State's disfavor of religion (if it can be called that)" in prohibiting recipients from using the scholarship to major in devotional theology "is of a far milder kind," the Court concluded that the scholarship program was not presumptively unconstitutional. *Id.* at 720. In upholding the program, the Court found that it "goes a long way toward including religion in its benefits"—for example, by allowing recipients to attend pervasively religious schools that are

accredited and to take devotional-theology courses. *Id.* at 724-25. To the Court, this "relatively minor burden" was justified by a "historic and substantial state interest" of not funding "an essentially religious endeavor." *Id.* at 721, 725. This interest, the Court explained, was rooted in our nation's history of "popular uprisings against procuring taxpayer funds to support church leaders" as well as the founding-era decisions of many states to "place[] in their constitutions formal prohibitions against using tax funds to support the ministry." *Id.* at 721-23. Considering this "historic and substantial state interest" alongside the "relatively minor burden," the Court found no violation of the Free Exercise Clause. *Id.* at 725.

*Locke* did not leave states with unfettered discretion to exclude the religious from generally available public benefits. To the contrary, Chief Justice Rehnquist's opinion for seven members of the Court was careful to acknowledge its parameters. *See id.* at 719, 725 (stating that "some" actions are permitted by the Establishment Clause but not required by the Free Exercise Clause and explaining that "[i]f any room exists between the two Religion Clauses, it must be here"). "The [*Locke*] opinion thus suggests, even if it does not hold, that the State's latitude to discriminate against religion is confined to certain 'historic and substantial state interest[s],' and does not extend to the wholesale exclusion of religious institutions and their students from otherwise neutral and generally available government support." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1255 (10th Cir. 2008) (McConnell, J.) (alteration in original) (citation omitted) (quoting *Locke*, 540 U.S. at 725). *Locke* "suggests the need for balancing interests: its holding that 'minor burden[s]' and 'milder' forms of 'disfavor' are tolerable in service of 'historic and substantial state interest[s]' implies that major burdens and categorical exclusions from public benefits might not be permitted in service of lesser or less long-established governmental ends." *Id.* at 1255-56 (alterations in original) (quoting *Locke*, 540 U.S. at 720, 725). Simply put, the *Locke* Court "indicated that the State's latitude with respect to funding decisions has limits." *Id.* at 1255.

Applying the balancing of interests contemplated by *Locke*, I conclude that Trinity Lutheran has sufficiently pled a Free Exercise violation. The disfavor of religion here is more pronounced than in *Locke*. The student in *Locke* could use his scholarship to attend a pervasively religious school that was accredited and to take courses in devotional theology there. And a pervasively religious school that received scholarship money even could require its students to take devotional-theology classes. 540 U.S. at 724-25. The program, as the Court put it, went "a long way toward including religion in its benefits." *Id.* at 724. The same cannot be said here. Trinity Lutheran has pled that the Department categorically prohibited the Learning Center from receiving a playground-surfacing grant because it is run by a church. This blanket prohibition is different in kind from the disfavor of religion that was present in *Locke*. Whereas the *Locke* program excluded religious study while also including it, *id.* at 724-25, the Department has entirely excluded the Learning Center from receiving a playground-surfacing grant. Much like the Tenth Circuit, I read *Locke* to impose some bounds on such a "wholesale exclusion of religious institutions and their students from otherwise neutral and generally available government support." *Colo. Christian*, 534 F.3d at 1255.

The Department's reason for singling out the Learning Center differs from the historic and substantial state interest in *Locke*, where the state sought to avoid paying for the training of clergy, "an essentially religious endeavor." 540 U.S. at 721-23. The sheer religiosity of this activity led the court to remark that "we can think of few areas in which a State's antiestablishment interests come more into play." *Id.* at 722. It is true that the Department's interest in enforcing Article I, § 7 of the Missouri Constitution is historic in the sense that this provision is longstanding. But the state's interest in *Locke* traced to concerns that were specific to paying for training the clergy. *Id.* at 722-23. The Court was unequivocal about this point: "[T]he only interest at issue here is the State's interest in not funding the religious training of clergy." *Id.* at 722 n.5. Here, by contrast, the Department seeks to enforce a general prohibition on aid to a church that is in no way specific to the playground-surfacing

grant program. This case therefore lacks the correspondence between the past and the Department's present interest that the Court found significant in *Locke*. *Cf. id.* ("Nothing in our opinion suggests that the State may justify any interest that its 'philosophical preference' commands."); *McDaniel v. Paty*, 435 U.S. 618, 628-29 (1978) (plurality opinion) (explaining that "the American experience provides no persuasive support" for an antiestablishment concern even though several states had constitutional provisions on the topic); *Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 750 F.3d 184, 195 (2d Cir. 2014) ("We do not mean to imply that merely by claiming the motivation of observing interests favored by the Establishment Clause a governmental entity gets a free pass, avoiding *all* scrutiny."), *cert. denied*, 575 U.S. ---, 135 S. Ct. 1730 (2015).

Perhaps more importantly, the substantial antiestablishment interest identified in *Locke* is not present here. Unlike a student preparing for the ministry, which is "an essentially religious endeavor," 540 U.S. at 721, schoolchildren playing on a safer rubber surface made from environmentally-friendly recycled tires has nothing to do with religion. If giving the Learning Center a playground-surfacing grant raises a *substantial* antiestablishment concern, the same can be said for virtually all government aid to the Learning Center, no matter how far removed from religion that aid may be. When the *Locke* Court spoke of a substantial antiestablishment concern, I seriously doubt it was contemplating a state's interest in not rubberizing a playground surface with recycled tires. *See Bronx Household of Faith*, 750 F.3d at 194 ("Underlying the Board's prohibition [of hosting religious services in school facilities] is a slightly different manifestation of the same historical and constitutional aversion to the use of public funds to support the practice of religion cited by the Court in *Locke*.").

In light of the Department's negligible antiestablishment interest, I conclude that the court overstates the significance of the Department's concern about giving a grant directly to the Learning Center, rather than having the money filtered through

-21-

the independent choice of private individuals. "Although private choice is one way to break the link between government and religion, it is not the only way." *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 295 (6th Cir. 2009). Indeed, even though the playground-surfacing program involves a direct transfer of funds to the Learning Center, the court concludes that "it now seems rather clear that Missouri could include the Learning Center's playground in a non-discriminatory Scrap Tire program without violating the Establishment Clause." *Ante* at 7. I agree. *See Am. Atheists*, 567 F.3d at 295 (collecting cases to demonstrate that the Supreme Court "has sustained a number of neutral aid programs that distributed aid directly to religious organizations—without filtering the aid through private choice—where the aid itself had no religious content and any actual diversion was de minimis"). And I, of course, agree with the court that, in many cases, a concern about giving money directly to a church-run school may amount to a historic and substantial state interest. Indeed, were it to be uncovered during discovery that the Learning Center regularly uses its playground for religious activities, my Free Exercise concern would be less acute. However, at this stage of the litigation, I cannot conclude that the Department's concern about direct funding for a rubber playground surface translates into a historic and substantial antiestablishment concern.

In concluding that Trinity Lutheran has stated a claim under the Free Exercise Clause, I acknowledge that "[t]he precise bounds of the *Locke* holding . . . are far from clear." *Colo. Christian*, 534 F.3d at 1254. However, the best reading of *Locke*, in my view, is that in the absence of a historic and substantial interest, the Department's "latitude to discriminate against religion . . . does not extend to the wholesale exclusion of religious institutions and their students from otherwise neutral and generally available government support." *See id.* at 1255. I therefore respectfully dissent from the court's affirmance of the dismissal of Trinity Lutheran's Free Exercise claim. Because this claim is linked to Trinity Lutheran's Equal Protection claim, I dissent from the court's disposition of this claim as well. *See Locke*, 540 U.S. at 720 n.3. Moreover, because I would reverse the district court's

dismissal of Trinity Lutheran's complaint, I need not reach the separate question of whether the district court abused its discretion by denying Trinity Lutheran's motion to amend that complaint. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 n.2 (5th Cir. 2009); *see also Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 358 n.70 (5th Cir. 1989) ("For purposes of our remand, we only point out to the trial court that leave to amend should be freely granted and denied only upon a showing of prejudice to the other party."). I otherwise concur in the court's opinion.

_____